IN THE OREGON TAX COURT
REGULAR DIVISION
Property Tax

| | |
|---|---|
| DELTA AIR LINES, INC., | ) |
| | ) |
| Plaintiff, | ) **TC 5409 (Control); TC 5418; TC 5433;** |
| v. | ) **TC 5452** |
| | ) |
| DEPARTMENT OF REVENUE, | ) |
| State of Oregon, | ) |
| | ) **ORDER ON CROSS-MOTIONS FOR** |
| Defendant. | ) **PARTIAL SUMMARY JUDGMENT** |

## I.   INTRODUCTION

Plaintiff, Delta Air Lines, Inc. (Delta), is an interstate and international air carrier doing business in Oregon. (Stip Facts at 1.)  As an "[a]ir transportation" company, its property is subject to central assessment, with consequences discussed below.  *See* ORS 308.515(1)(e).[1] Delta appeals from the Opinion and Order (O&O) issued by Defendant (the Department) for property tax year 2019-20,[2] which determined a real market value of (1) $50 billion for Delta's worldwide property valued as a unit, or "system,"[3] and (2) an allocated real market value of $212,560,000 for Delta's property situed in Oregon.  (Stip Facts at 2; 10/31/2019, Delta Compl

---

[1] Unless otherwise specified, the court's references to the Oregon Revised Statutes (ORS) are to the 2017 edition.

[2]  Appeals for the following tax years have been consolidated with this case for pretrial purposes: 2020-21 (TC 5418), 2021-22 (TC 5433), 2022-23 (TC 5452).  Delta also appealed tax year 2023-24 (TC 5460), which has not been consolidated. Except to the extent discussed below, the relevant law was the same for all of the foregoing tax years.

[3] As is customary, the court refers to the property comprising this valuation unit as a "system." *See, e.g., Alaska Airlines, Inc. v. Dept. of Rev.*, 307 Or 406, 410, 769 P2d 193 (1989) (describing formulary allocation of taxpayer's "total system value"); *see* Or Laws 1909, ch 218, § 4.15 (referring to companies "doing business as one system, partly within this State and partly without, or so doing business in more than one county of the State.").

at 4 (O&O).)  Each of these values includes some amount attributable to intangible property, such that the value would be less if intangible property were excluded.  (*See* Stip Facts at 2.)

Delta's complaint asserts two claims:

1. That assessment for taxation of Delta's intangible property violates the Uniformity Clauses of the Oregon Constitution (Or Const, Art I, § 32; Art IX, § 1) and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution (US Const, Am XIV).

2. That the Department's allocation of Delta's unit value to Oregon:

   a. Does not fairly reflect the real market value of Delta's property that has a situs in Oregon and

   b. Results in the taxation of Delta's property located outside Oregon.

(*See* 10/31/2019, Delta's Compl at 2.)  Delta's first claim is now before the court on Delta's and the Department's cross-motions for partial summary judgment.

## II.  PROCEDURAL BACKGROUND

After an initial set of briefs on the parties' cross-motions in this case, the court held a first hearing on April 28, 2021, at which it heard oral argument and directed the parties to address certain issues in supplemental briefing.  (*See* 5/5/2021, Ct Ltr.)  While the cross-motions were under advisement, another centrally assessed taxpayer pursuing its own valuation appeal, PacifiCorp, moved for leave to amend its complaint to add a claim similar to Delta's regarding the validity of taxation of its intangible property for tax year 2020-21. [4]  (*See* 10/1/2021, PacifiCorp Motion to Amend Complaint, *PacifiCorp v. Dept. of Rev.*, No. 5411.)  On November 8, 2021, the court issued an order in *PacifiCorp* allowing the amendment but staying proceedings on PacifiCorp's new, constitutional claim until after the trial set for later that month.  (*See* 11/8/2021, Order Granting Plaintiff's Motion for Leave to Amend Complaint, *PacifiCorp*, No.

---

[4] PacifiCorp's claim differs from Delta's only in that PacifiCorp asserts its claim solely under the Oregon Uniformity Clauses.

5411.)  Also on November 8, 2021, the court issued a letter in *Delta*, with copies to the parties in *PacifiCorp*, that requested additional briefing on certain tentative conclusions of the court, as well as four further questions related to Delta's claims.  The letter invited the parties in both cases to consider a joint hearing for oral argument on the tentative conclusions and questions, and the parties in both cases agreed.  (*See* 11/8/2021, Ct Ltr.)  Shortly after the *PacifiCorp* trial, on January 18, 2022, the court held a single hearing at which the court heard oral argument from the parties in both cases.  The court directed the parties to file a final set of briefs, which the parties completed on May 18, 2022.  (*See* 1/19/2022, 1/25/2022, 1/27/2022, Emails with Counsel in *Delta* and *PacifiCorp*).  Delta and PacifiCorp responded separately from each other, but neither Delta nor PacifiCorp has expressed substantive disagreement with the other's arguments.[5]

PacifiCorp's March 2, 2022 brief concludes as follows:  "PacifiCorp joins Delta in its request that the court grant summary judgment finding that ORS 307.030(2) is unconstitutional * * *."  (3/2/2022, PacifiCorp Br at 32.)  Accordingly, the court treats PacifiCorp as having moved for partial summary judgment as to the second, constitutional claim in its October 25, 2021, First Amended Complaint, and the court treats the Department as having cross-moved for partial summary judgment as to that same claim of PacifiCorp.  The court today issues a separate order, incorporating this order, on the cross-motions regarding PacifiCorp's constitutional claim.[6]

For convenience, the remainder of this order uses the term "Taxpayer" to mean both Delta and PacifiCorp.

---

[5] The Department responded separately to each brief.

[6] The court issued its opinion in the valuation trial in PacifiCorp's case on May 24, 2023; following reconsideration, the court issued an amended opinion on July 17, 2023.

## III.    ISSUE

Are Oregon's Uniformity Clauses or the federal Equal Protection Clause violated by Oregon's taxation of intangible personal property only when used or held for future use in a business listed in ORS 308.515(1)? [7]

## IV.  LEGAL BACKGROUND

A.    *Oregon Uniformity Clauses and Federal Equal Protection Clause*

As is true for nearly every state, the Constitution of Oregon imposes requirements of uniformity of taxation. *See* Jerome R. Hellerstein & Walter Hellerstein, 1 State Taxation ¶ INTRO PT II (3d ed 2023) ("[A]lmost every state constitution contains an explicit constitutional requirement of uniformity and equality in taxation * * *."). Oregon has two Uniformity Clauses. Article I, section 32, provides in relevant part: "[A]ll taxation shall be uniform on the same class of subjects within the territorial limits of the authority levying the tax." Article IX, section 1, provides in relevant part: "The Legislative Assembly shall * * * provide by law uniform rules of assessment and taxation. All taxes shall be levied and collected under general laws operating uniformly throughout the State." The Oregon Supreme Court has declared that "[t]he two sections are to be read together." *State ex rel. v. Malheur County Court*, 185 Or 392, 410-11, 203 P2d 305 (1949).

The current text of both Uniformity Clauses reflects amendments in 1917, which the Oregon Supreme Court has discussed. *See Mathias v. Dept. of Rev.*, 312 Or 50, 57-60, 817 P2d

---

[7] Neither Delta nor PacifiCorp refers specifically to Oregon's equal protection clause. *See* Or Const, Art I, § 20. However, the Oregon Supreme Court has applied the same analysis to the equal protection clauses of Article I, section 20 of the Oregon Constitution and the Fourteenth Amendment to the United States Constitution. *Knapp v. City of Jacksonville*, 342 Or 268, 276, 151 P3d 143 (2007) ("Article I, sections 20 and 32, of the Oregon Constitution and the Equal Protection Clause of the United States Constitution, require plaintiffs to establish that the city had no rational basis for creating the class of persons subject to the charges.") (citing *Crocker and Crocker*, 332 Or 42, 55, 22 P3d 759 (2001) ("We think that the constitutional analysis that we have advanced under Article I, section 20, of the Oregon Constitution, applies equally under the federal standard[.]")).

272 (1991), *aff'g* 11 OTR 347 (1990); *Jarvill v. City of Eugene*, 289 Or 157, 170-84, 613 P2d 1 (1980). By requiring that taxation be "uniform on the same class of subjects," rather than "equal and uniform," the framers of the amendments "confirmed that property could be broken up into rational classes and treated differently class by class." *Mathias*, 312 Or at 58.

The requirement of a "rational class" under the Uniformity Clauses overlaps substantially with the requirement under the federal Equal Protection Clause that a legislative classification have a "'rational relation to some legitimate end.'" *See* US Const, Am XIV, § 1 ("[N]or [shall any State] deny to any person within its jurisdiction the equal protection of the laws."); *Crocker and Crocker*, 332 Or 42, 55, 22 P3d 759 (2001) (quoting *Romer v. Evans,* 517 US 620, 631, 116 S Ct 1620, 134 L Ed 2d 855 (1996)); *Jarvill,* 289 Or at 184 (denying claim under Article I, section 32 and Equal Protection Clause "[f]or the same reasons"). As the Oregon Supreme Court most recently summarized, a claim that a tax

> "violated the provisions of Article I, sections 20 and 32, of the Oregon Constitution and the Equal Protection Clause of the United States Constitution, require[s the taxpayer] to establish that the [legislative body] had no rational basis for creating the class of persons subject to the charges. *See Crocker and Crocker*, 332 Or 42, 55, 22 P3d 759 (2001) (stating standard with respect to equal privileges and immunities and equal protection analysis); *Jarvill v.City of Eugene*, 289 Or 157, 613 P2d 1 (1980) (stating standard). A classification is rationally based 'if it rests upon genuine differences' and those differences bear a 'reasonable relationship to the legislative purpose.' *Jarvill*, 289 Or at 180, 613 P2d 1; *Huckaba v. Johnson*, 281 Or 23, 26, 573 P2d 305 (1978)."

*Knapp*, 342 Or at 276 (upholding city water and sewer bill surcharges solely on developed property, because city "'could have correctly concluded that safety needs increase when property is developed'") (quoting 18 OTR 22, 38 (2004) (*Knapp I*)). The task of this court, therefore, is to determine whether the legislature based the classification in this case on genuine differences that bear a reasonable relationship to a legislative purpose. Under this standard, the legislature need not have articulated its legislative purpose; it suffices if the court can conceive of "'some

legitimate end.'" *Crocker*, 332 Or at 55 (quoting *Romer*, 517 US at 631). The court will discuss this standard in greater detail below, before evaluating the parties' arguments regarding classification.

Although the Oregon Uniformity Clauses and the federal Equal Protection Clause have been held to share the same standard, Oregon's "first-things-first" doctrine requires the court to analyze Taxpayer's Uniformity Clause claims first. *See Hughes v. State of Oregon*, 314 Or 1, 12, 838 P2d 1018 (1992). Doing so also safeguards against the possibility that developments in the federal standard, or its application, might confuse the court's interpretation of the Oregon Clauses. *See Tharalson v. State Dept. of Rev.*, 281 Or 9, 15 n 10, 573 P2d 298 (1978) ("Even when the verbal 'tests' are similar, however, a state's application of its own constitution is independent of federal review and of changing applications of the fourteenth amendment, as have occurred since *Standard Lumber Co. v. Pierce*, [112 Or 314, 228 P 812 (1924)].").

Accordingly, this court will first apply precedent under Oregon's Uniformity Clauses, before turning to the larger body of Equal Protection case law for any different or supplemental points.

B.      *Central Assessment and Treatment of Intangible Property*

The Oregon Supreme Court has charted the origins and nature of the "central assessment" of property used in certain businesses. *See Northwest Natural Gas Co. v. Dept. of Rev.*, 347 Or 536, 538-39, 226 P3d 28 (2010); *Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 289-93, 337 P3d 728 (2014); *DISH Network Corp. v. Dept. of Rev.*, 364 Or 254, 257-83, 434 P3d 379 (2019); *see also Level 3 Communications LLC III v. Dept. of Rev.*, 23 OTR 440, 458-78 (2019), *aff'd* 368 Or 303, 490 P3d 149 (2021). In 1909 the legislature adopted the four basic elements of the statutory scheme, which remained in effect for the years at issue here:

(1) "Unit valuation" of the system of property, within and without Oregon, used in a listed business. *See* ORS 308.555 ("[The Department] may value the entire property, both within and without the State of Oregon, as a unit.").

(2) The inclusion of intangible property in the definition of property to be valued. *See* ORS 308.505(14) (defining "Property" as including "all property of any kind, * * * tangible or intangible").[8]

(3) The use of formulas to allocate a portion of the system value to the "property that has a situs in this state," and to further apportion that value to localities within Oregon. *See* ORS 308.550 (describing allocation to state); ORS 308.565 (describing apportionment to counties).

(4) "Centralizing" the task of valuing the property used in the listed businesses in one statewide agency while retaining "local assessment" by county assessors for all other property. *See* ORS 308.210(1) (instructing county assessor to assess value of all taxable property in county); ORS 308.515 (instructing the Department to assess property used in listed businesses).

The legislature has always identified businesses for central assessment of property by means of a list. Except for uncodified findings adopted by the 2009 legislature as discussed below, the legislature has never stated an express test for selecting businesses for central assessment.[9] The list has changed over the years. The table below shows the businesses on the original 1909 list and those on the list in effect for the tax years at issue in this case.

| 1909 Central Assessment List | Central Assessment List in ORS 308.515(1) |
| --- | --- |
| Railroad Companies | Railroad Transportation |
| Sleeping Car Companies | Railroad Switching and Terminal |
| Union Station and Depot Companies | Electric Rail Transportation |
| Electric and Street Railway Companies | Air Transportation |

---

[8] The 1909 definition expressly included "franchises and special franchises"; the 1913 legislature added "tangible and intangible." Or Laws 1909, ch 218, §1; Or Laws 1913 ch 193, § 5.

[9] The legislature's use of a list in ORS 308.515(1) contrasts with the more typical approach of stating a definition based on express criteria. An example of the latter is the three-factor definition of a "unitary business" for purposes of taxing the income of a multistate enterprise. *See* ORS 317.705(3). Derived from the same case law that approved unit valuation for property tax purposes, the unitary business principle allows a state to determine taxable income as an apportioned share of the entire net income if the business is characterized by "centralized management," "economies of scale," and "functional integration." *See generally* Hellerstein & Hellerstein, 1 State Taxation at ¶ 8.05 ("The unit rule is the progenitor of the contemporary 'unitary business principle' that underlies the use of formulary apportionment [for state income tax purposes].") (citing *State Railroad Tax Cases*, 92 US 575, 608, 2 Otto 575, 23 L Ed 663 (1875)).

| Express Companies | Water Transportation upon Inland Water of the State of Oregon |
|---|---|
| Telegraph Companies | Air or Railway Express |
| Telephone Companies | Communication |
| Refrigerator Car Companies | Heating |
| Oil and Tank Line Companies | Gas |
| Heat, Light, Power, Water, Gas, and Electric Companies | Electricity |
| | Pipeline |
| | Toll Bridge |
| | Private railcars of all companies not otherwise listed in this subsection, if the private railcars are rented, leased, or used in railroad transportation or hire |

Since 1935 the taxation of intangible property has been a feature unique to central assessment. *See* Or Laws ch 274, § 1; ORS 307.030(2) (stating intangible property not used in a business listed in ORS 308.515(1) is "not subject to assessment and taxation").[10] As the Oregon Supreme Court recently discussed, the inclusion of intangible property for central assessment and taxation also distinguishes Oregon from states that bar the taxation of intangible property.

---

[10] For all purposes other than central assessment, ORS 307.020(1)(a) defines intangible property as follows:

"(a) 'Intangible personal property' or 'intangibles' includes but is not limited to:

"(A) Money at interest, bonds, notes, claims, demands and all other evidences of indebtedness, secured or unsecured, including notes, bonds or certificates secured by mortgages.

"(B) All shares of stock in corporations, joint stock companies or associations.

"(C) Media constituting business records, computer software, files, records of accounts, title records, surveys, designs, credit references, and data contained therein. "Media" includes, but is not limited to, paper, film, punch cards, magnetic tape and disk storage.

"(D) Goodwill.

"(E) Customer lists.

"(F) Contracts and contract rights.

"(G) Patents, trademarks and copyrights.

"(H) Assembled labor force.

"(I) Trade secrets."

*See DISH Network*, 364 Or at 291-92 (contrasting California approach).

A comparative timeline in the attached Appendix shows relevant developments in (1) the taxation of intangible property, (2) central assessment, and (3) the Uniformity Clauses.[11]

C.     *Standard of Review*

The court will grant a motion for summary judgment if the pleadings, "declarations, and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to prevail as a matter of law." Tax Court Rule (TCR) 47 C; *Christensen II v. Dept. of Rev.*, 23 OTR 155, 162 (2018). When considering each party's cross motion, the court reviews the evidence "in a manner most favorable to the adverse party." TCR 47 C; *see Two Two v. Fujitech America, Inc.*, 355 Or 319, 331, 325 P3d 707 (2014) (stating standard under analogous Oregon Rule of Civil Procedure 47 C). The moving party will prevail as a matter of law if no "objectively reasonable" factfinder could find for the adverse party. TCR 47 C; *Christensen II*, 23 OTR at 163.

## V.   ANALYSIS

A.     *Timing for Application of Constitutional Test*

Because the relevant statutes have evolved over the course of approximately 100 years, there is some room to debate at what point the legislature fully enacted the difference in treatment at issue in this case. This raises the following issue: As of when in the course of this evolution should the court test the constitutional rationality of the statutes? Taxpayer argues that the court should apply the tests to the law as of the date of enforcement, *i.e.* January 1, 2019, through January 1, 2022, but Taxpayer also asserts that the law lacked a rational basis when

---

[11] The court appreciates the parties' contribution to this timeline through supplemental briefing at the court's request following oral argument. (*See* 6/8/2021, Delta Resp to Court's 5/5/21 Ltr; 6/25/2021, Dept Post-Arg Resp Br.)

enacted. (6/8/2021, Delta Post-Arg Resp Br at 25-28.) The Department argues that the appropriate testing date is the effective date of 1935 legislation that exempted intangible property from local assessment and taxation, but the Department also asserts that the same concerns that motivated the legislature's actions in 1935 still exist. (6/8/2021, Dept Post-Arg Br at 2-6.)

Following the Oregon Supreme Court's opinion in *Leathers v. City of Burns*, 251 Or 206, 444 P2d 1010 (1968), the court will apply the tests for validity under the Oregon and federal constitutions as of the applicable assessment dates. *Leathers* applied a rationality test to two local gasoline delivery or storage ordinances.[12] The court invalidated one of the ordinances, which prescribed a maximum capacity for gasoline storage tanks, based on the facts as of the date of trial. *See also U. S. v. Carolene Products Co.*, 304 US 144, 153, 58 S Ct 778, 82 L Ed 1234 (1938) ("[T]he constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist."). *Leathers* has not been overturned. *But see Ag West Supply v. Hall*, 126 Or App 475, 481-82, 869 P2d 383 (1994) (applying rational basis tests[13] to state cardlock gasoline dispensing laws as of the date of enactment because plaintiff claimed that statutes were unconstitutional when enacted).[14]

---

[12] In *Leathers,* the plaintiff asserted violations of the Due Process and Equal Protection Clauses of the United States Constitution, as well as "comparable provisions of the Constitution of Oregon." 251 Or at 218.

[13] In *Ag West* the plaintiffs asserted violations of Article I, section 20, of the Oregon Constitution, and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. 146 Or App at 477.

[14] The Court of Appeals applied the reasoning of then-retired Justice Hans Linde in a law review article written during his tenure as a law professor. *See* Hans Linde, *Due Process of Lawmaking*, 55 Neb L Rev 197, 215-22 (1976)). Linde's article criticized *Leathers*, pointing out that the city in that case had adopted its ordinance some 16 years before the plaintiff's facts arose, yet "[n]o one stopped to question the original validity of the ordinance under the conditions of 1949; only the conditions at the date of trial were considered." Linde, 55 Neb L Rev at 218.

B.    *What Is the Class?*

The court's next task is to define the legislative classification that Taxpayer challenges. The parties offer differing views.  Taxpayer presents intangible property as one of three major classes of property, intrinsically distinct from the classes of real property and tangible personal property.  (*See* 3/12/2021, Delta Reply & Resp at 1.)  Taxpayer asserts that the central assessment laws invalidly subdivide the class of intangible property into the classes of taxable and nontaxable, based on whether the property is used in a business listed in ORS 308.515(1).[15]

The Department takes the position that the only relevant classification is between centrally assessed property and locally assessed property.  (2/12/2021, Dept MPSJ at 5; 4/2/2021, Dept Reply at 1-2 ("All centrally assessed property is valued and taxed; no distinction is made between types of property. There is no 'intangible property tax' as such. * * * Therefore, tax is not imposed on intangible property as a separate class."); Argument of Marilyn Harbur, Oral Argument, Jan 18, 2022, 2:14-2:15.)  According to the Department, having drawn that classification, the legislature is free to tax the property differently within each of the two classes: the legislature may exempt intangible property on the locally assessed side of the line, while taxing intangible property on the centrally assessed side of the line.  (Argument of Marilyn Harbur, Oral Argument, Jan 18, 2022, 2:14-2:15.)  At times, the Department claims that the class of centrally assessed property is indivisible; therefore, intangible property subject to central assessment must be taxed. (4/2/2021, Dept Reply at 1-2; 6/25/2021, Dept Post-Arg Resp Br at 4.)

The court analyzes the two principal statutes, applying the framework in *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009).  The first principal statute is ORS 307.030, which the

---

[15] Taxpayer emphasizes that it does not challenge the application of any of the other features of central assessment, including unit valuation and formulary allocation and apportionment as a valid method for determining the *value* of Taxpayer's Oregon property subject to taxation.  For purposes of its motion, Taxpayer disputes only the notion that central assessment requires or justifies *taxing* its intangible property when similar intangible property, not subject to central assessment, is not taxed.  (*See* 3/12/2021, Delta Reply & Resp at 3.)

Oregon Supreme Court has found applicable to both centrally and locally assessed property. *See Northwest Natural Gas*, 347 Or at 546 n 8 (stating ORS 307.030 contains "the provisions that subject [a centrally assessed] taxpayer's property to assessment and taxation."). ORS 307.030 states:

> "(1) *All real property* within this state and *all tangible personal property* situated within this state, except as otherwise provided by law, shall be subject to assessment and taxation in equal and ratable proportion.
>
> "(2) Except as provided in ORS 308.505 to 308.674, *intangible personal property* is not subject to assessment and taxation."

(Emphasis added.) The text thus purports to state a general rule, that "all" real and tangible personal property is assessable and taxable, while intangible property is not. The text supports the first part of Taxpayer's position, namely, that the legislature generally distinguishes among three classes of property: real property, tangible personal property, and intangible personal property. Under subsection (1), the first two classes (all real and tangible personal property) generally are taxable, barring an exception "otherwise provided by law." *Id*. Under subsection (2), the third class (intangible property) generally is not taxable, barring an exception "as provided in [the central assessment statutes]." *Id.*

The text of the other principal statute, ORS 308.505(14), defines "property," as used in the central assessment statutes, as follows:

> "As used in ORS 308.505 to 308.681:
>
> "* * * * *
>
> "(14) 'Property':
>
> "(a) Means all property of any kind, whether *real, personal, tangible or intangible*, that is used or held by a company as owner, occupant, lessee or otherwise, for the performance or maintenance of a business or service or for the sale of a commodity, as described in ORS 308.515;
>
> "(b) Includes, but is not limited to, the lands and buildings, rights of way,

roadbed, water powers, vehicles, cars, rolling stock, tracks, office furniture, telephone and transmission lines, poles, wires, conduits, switchboards, machinery, appliances, appurtenances, docks, watercraft irrespective of the place of registry or enrollment, merchandise, inventories, tools, equipment, machinery, franchises and special franchises, work in progress and all other goods or chattels; and

"(c) Does not include items of intangible property that represent:

"(A) Claims on other property, including money at interest, bonds, notes, claims, demands or any other evidence of indebtedness, secured or unsecured; or

"(B) Any shares of stock in corporations, joint stock companies or associations."

ORS 308.505(14) (emphasis added). The text of this definition of "property," applicable solely to the central assessment statutes, creates the kind of exception referred to in ORS 307.030(2) by including "intangible" property (other than stocks and debt instruments) within the definition of "property" that is required to be centrally assessed if used in one of the businesses listed in ORS 308.515(1).

The court sees nothing in the text of these two statutes that eliminates the classes of real property, tangible personal property, and intangible property when property is centrally assessed. On the contrary, the definition of "property" for purposes of central assessment refers to "all property of any kind, whether *real, personal, tangible or intangible*." ORS 308.505(14)(a) (emphasis added). The text of the central assessment statute thus recognizes and preserves the classification made in ORS 307.030 among real property, tangible personal property, and intangible property.[16]

---

[16] In other words, the text reveals two sets of classifications relevant to this case: (1) the classification that divides property into the three classes of (a) real property, (b) tangible personal property, and (c) intangible property; and (2) the classification that divides property into the two classes of (a) locally assessed property and (b) centrally assessed property. Each set of classifications (1) and (2) is superimposed simultaneously over the larger category of "property"; both sets of classifications remain distinct, and neither set obscures the other. The result is to overlay a grid consisting of six squares, one of which contains property that is both "intangible" and "centrally assessed." Property within that square is taxable by operation of ORS 307.030(2) and ORS 308.505(14).

The court turns to statutory context. The court readily identifies at least three statutes that undermine the Department's position that, within the class of centrally assessed property, there is no distinction among real property, tangible personal property, and intangible property. Exemptions or exclusions solely for intangible property that otherwise would be centrally assessed are found in ORS 308.505(14)(c) (excluding, generally, "*items of intangible property that represent*" stocks and bonds from definition of "property") (emphasis added);[17] ORS 308.674(1) (capping *overall* real market value by reference to the cost of "*real property and tangible personal property*") (emphasis added); and ORS 308.671(2) (exempting from taxation "licenses" granted by the Federal Communications Commission, as well as "franchises" held by companies in the communication business).[18] These statutes illustrate that the class of intangible property is not subsumed or eliminated merely because the property also is within the class of centrally assessed property.

The Oregon Supreme Court's decision in *Northwest Natural Gas* is consistent with Taxpayers' position and inconsistent with the Department's position in this case. In *Northwest Natural Gas*, the court held that an exemption for "inventory" in ORS 307.400 (2005) applied to the taxpayer's stores of gas held underground for sale to customers. 347 Or at 563. The definition of "inventory" was expressly limited to "[i]tems of *tangible personal property*." ORS 307.400 (2005) (emphasis added); *see* ORS 307.400 (same).

The court concludes that the classification at issue in this case incorporates both the division between centrally and locally assessed property and the division among the three classes of real property, tangible personal property, and intangible property. The resulting classes at

---

[17] The Oregon Supreme Court referred to this "exclu[sion from] central assessment" in *Northwest Natural Gas*; at that time the exclusion was codified as ORS 308.510(1) (2005). *See Northwest Natural Gas*, 347 Or at 554.

[18] The statute specifies a value (book value, less accrued, reserved depreciation) that is exempt. ORS 308.671(3).

issue here are those of (1) intangible property used in a business listed in ORS 308.515(1) (taxable), and (2) all other intangible property (not taxable).

C.    *Uniformity Clauses Require a Two-Part Analysis*

Having established the relevant classification, the court must now identify any "rational basis" for taxing or not taxing intangible property according to its use (or not) in the particular businesses listed in ORS 308.515(1). As summarized above, a rational basis exists if (1) the classification is based on "genuine differences," and (2) "those differences bear a reasonable relationship to the legislative purpose." *Knapp*, 342 Or at 276 (internal quotations omitted). The court examines these two requirements in greater detail.

1.    *"Genuine differences" require objectively determinable features or uses relevant to the subject of the classification.*

As to the first requirement, in *Knapp* the court concluded that genuine differences existed between "developed property," on which the city of Jacksonville's ordinance imposed certain water surcharges, and undeveloped property, to which the surcharges did not apply. *Id.* The ordinance specified that the obligation to pay the surcharge "'arises when a person responsible uses or otherwise benefits from Public Safety services,' which was presumed to occur whenever a property was developed property." *Knapp I*, 18 OTR at 27 (quoting Jacksonville Public Safety Act § 3.01.040(3) (2003)). There appears to have been no disagreement among the parties about the meaning of "developed property."[19]

In *Jarvill*, the uniformity issues were whether the city of Eugene could (1) create a special geographically defined district for the downtown core and impose new property, sales, and gross receipts taxes solely within that district, and (2) within that district, impose flat taxes

_____

[19] Other provisions in the ordinance referred to each "'residential unit'" and each "'nonresidential unit,'" defined terms that included references to "'living facilities'" and a "'non-residential structure which provides facilities for one or more businesses * * *'" respectively. *Id.* (quoting Jacksonville Public Safety Act § 3.01.040(2) (as amended Oct 7, 2003).

on professional businesses while taxing other businesses on a percentage of sales or gross receipts. The court upheld the new taxes. The court discussed two types of qualitative differences that could distinguish land in different geographic areas: "natural qualities" (such as annual rainfall) and "politically imposed qualities," including those resulting from economic or human conditions. *Jarvill*, 289 Or at 180. The court concluded that the downtown area was characterized by distinct economic or human conditions, including "difficulty of access, scarcity of parking, density, degeneration of physical plant, loss of consumer patronage, esthetic depreciation, concentration of polluting agents, declining value and other * * * economic and physical factors of contemporary urban life * * *." *Id.* at 181 (quoting *Jarvill v. City of Eugene,* 40 Or App 185, 196, 594 P2d 1261 (1979)). The court also concluded that the downtown district was distinct because the city, by amendment of its charter through a vote of the people, had "committed itself to providing services and programs that patently and physically distinguish the District from any other area of the city." *Id.*

From these two cases, this court concludes that the existence of objectively determinable features intrinsic to the property can support a finding of "genuine differences" for purposes of the rational basis analysis. Objectively determinable features may include economic or politically imposed attributes.

Other longstanding cases establish a difference in use as an additional kind of "genuine difference" for Uniformity Clause purposes. Ten years after the Uniformity Clauses had been amended, the Oregon Supreme Court interpreted them to uphold a statute classifying as exempt from tax "such real estate belonging to [literary, benevolent, charitable and scientific institutions] as shall be *actually occupied* for the purposes for which they were incorporated." Oregon Laws, title XXIX, ch II, § 4235 (1920) (emphasis added); *see Corporation of Sisters of Mercy v. Lane*

*Co.*, 123 Or 144, 261 P 694 (1927). The court reasoned that the "adoption of a legislative policy exempting hospitals from taxation is predicated upon the theory that the establishment and maintenance of *charitable* hospitals serves the public welfare." *Sisters of Mercy*, 123 Or at 164 (emphasis added). As a second example, in *People's Util. Dist. et al v. Wasco Co. et al*, the taxpayer was a people's utility district, a local government entity, whose property was subject to tax. 210 Or 1, 305 P2d 766 (1957); Or Laws 1939 ch 387, § 10 (subjecting property to tax if "owned, used, operated or controlled by any people's utility district in or for the production, transmission, distribution or furnishing" of electric power). The taxpayer argued that the law violated the Uniformity Clauses because "'[t]he property of a PUD is the only property in Oregon of any municipality or public corporation dedicated to a public purpose which is subject to ad valorem property taxation.'" *People's Util. Dist.*, 210 Or at 21. The court upheld the classification based on two conceivable differences:

> "The first is that people's utility districts have as their primary province the furnishing of utility services, in this case, electricity. Those municipalities which operate power plants do so, on the other hand, as an incident to their main function of operating a local governmental structure. Another factor settles around the use to which the electric power is put. Although both people's utility districts and municipalities provide service to paying customers, municipalities provide power for themselves to assist in their own operations, such as lighting streets and illuminating and providing power for municipal buildings."

*Id.* at 22. Both rationales rely on differing uses to determine whether otherwise identical property is taxable. In the first rationale, the distinction turns on whether power production is an incidental part of a larger municipal purpose. In the second, the distinction is between use of the property to generate electricity solely for sale versus for both sale and for operation of city-owned light fixtures.

From the *Sisters of Mercy* and *People's Util. Dist.* cases, this court concludes that the legislature may, without running afoul of the Uniformity Clauses, subject otherwise identical

property to different tax treatment based on a difference in use. That difference in use may have nothing to do with the intrinsic characteristics of the property. In the case of real property, *Sisters of Mercy* teaches that the Uniformity Clauses permit the same hospital building and grounds to be taxed or not, depending on factors such as whether the persons running the facility use it to treat only paying patients or also those who cannot pay. *See* 123 Or at 151 (recounting hospital superintendent testimony: "If people have it, we ask for it. If not, we don't."). Similarly, *People's Util. Dist.* establishes that the same electricity generation plant and equipment can be taxed or not, depending on whether the public operator uses it to generate power for sale or uses substantial amounts of the power to light public facilities without charge.

Finally, the Oregon Supreme Court's decision in *Mathias* establishes by implication that "genuine" differences include only those that are relevant to the classification and the purpose it serves. In *Mathias* (the only case in which the Oregon Supreme Court has invalidated a tax classification for violation of the Uniformity Clauses),[20] the classification at issue was the so-called "developer's discount," which was a statutory requirement to value a group of four or more vacant lots in the same subdivision differently, depending on whether they were held by the same owner. *See* ORS 308.205(3) (1989) (added by Or Laws 1989, ch 796, § 30 (HB 2338)) ("If the property consists of four or more lots within one subdivision, and the lots are held under one ownership, the lots shall be valued under a method which recognizes the time period over which

---

[20] *Redfield et al. v. Fisher et al.* mentions the Uniformity Clauses but reaches a conclusion under federal Equal Protection. *See* 135 Or 180, 201-04, 292 P 813 (1930). On rehearing, the court specifically declined to construe the amended Uniformity Clauses. *See Redfield et al. v. Fisher et al.*, 135 Or 205, 207-08, 295 P 461 (1931) (stating that the previous decision "nowhere attempted to construe the amended sections of our [state] Constitution). The court, under federal Equal Protection, invalided a tax on intangibles because the treatment of individuals and corporations was different. *See Redfield*, 135 Or at 199. The court's reasoning in *Redfield* was based on *Quaker City Cab Co. v. Penna.*, 277 US 389, 48 S Ct 553, 72 L Ed 927 (1928), which has since been overruled as "a relic of a bygone era" in *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 US 356, 365, 93 St Ct 1001, 35 L Ed 2d 351 (1973). *Tharalson*, 281 Or at 17 n 12.

those lots must be sold in order to realize current market prices for those lots."). The court invalidated the classification statute because the court found that all the parcels of vacant land at issue, whether or not under common ownership, were, "*identically*, 'lots' in subdivisions, not properties of inherently different kinds or uses." *Mathias*, 312 Or at 61 (emphasis added). By referring to the lots as "identical[ ]," the court implicitly put no significance on the fact that every lot necessarily differs from any other lot, as no piece of land can occupy the space of any other piece of land. Each lot in *Mathias* must have had a unique location and at least detectable differences in view, as well as different proximity to corners, cross streets, and improvements such as fire hydrants. The court focused instead on identifying any differences relevant to the purpose of the classification: determining the property's market value. Finding no relevant differences, the court invalidated the "developer's discount" classification as not based on "genuine difference[s]." *Id*. at 62-63.

The court thus restates the elements of the "genuine differences" requirement. "Genuine differences" are objectively determinable features relevant to the purpose of the classification, which may include physical, economic, or political features of the kind or use of the property. Applying this requirement, the court will look for differences relevant to the taxation or exemption of intangible property, keeping in mind that the legislature is free to create subclasses or to aggregate items together under one general classification for different reasons. *See Jarvill*, 289 Or at 180 ("[I]f a subterritory is different in quality compared to the rest of the territory, then article I, section 32, does not prohibit a taxing authority from defining the subterritory as a separate class."). In other words, any one, or any grouping, of the fourteen types of business

/ / /

/ / /

listed in ORS 308.515(1) could have its own distinct set of genuine differences relevant to the taxation of intangible property.[21]

2. *The court may infer the legislative purpose and the "reasonable relationship" to genuine differences.*

Turning to the second requirement, in *Knapp* the purpose of the sewer and water surcharge ordinance was to "help pay for the benefits conferred on [c]ity residents and businesses by the provision of an adequate program of public safety * * *." *Knapp*, 342 Or at 271 (internal citations omitted). The Oregon Supreme Court determined that the city "'could have correctly concluded that safety needs increase when property is developed.'" *Id*. at 276 (quoting *Knapp I*, 18 OTR at 38). That determination supplied the reasonable relationship justifying the surcharges. In *Jarvill*, the court implicitly concluded that the city had the public purpose of "'economic promotion and development for the district,'" as stated in the charter amendment. 289 Or at 159 (quoting Eugene City Charter, ch VII, § 48(70) (1973)). The trial court found that the taxes raised would be expended on free parking and advertising services that would revitalize the downtown district and benefit the city as a whole. *See id.* at 170. The Supreme Court implicitly relied on this finding in upholding the constitutionality of the ordinance.

These cases are consistent with the approach in other "rational basis" cases, in which the court considers public purposes expressly stated in the law (as in *Jarvill*) or capable of being inferred from the facts (as in *Knapp*), that lawmakers "rationally could believe" would be

---

[21] For comparison, ORS 307.030(1) classifies all real property and all tangible personal property either as "subject to assessment and taxation" or as exempt from taxation if "otherwise provided by law." Within the class of exempt property, both art museums and sewage treatment facilities are eligible for exemption from property tax, but each for different reasons and under different sets of classifying requirements. *See* ORS 307.130(2) (art museums and "literary, benevolent, charitable and scientific institutions"); ORS 307.118 (exempting certain sewage and wastewater treatment facilities); *see, e.g., Fox v. Galloway*, 174 Or 339, 148 P2d 922 (1944) (upholding in part, against uniformity and equal protection challenges, privilege tax, at different rates, on operation of coin-operated games, jukeboxes, and penny-operated amusement devices).

promoted by the classification. *See Crocker*, 332 Or at 55 ("A legislator rationally could believe that households in which the parents do not live together might need judicial assistance in making educational decisions, because the absence of cohabitation itself likely reflects a lack of harmony and consensus in parental decision-making.").

The court now applies the two-part analysis in *Knapp* to the parties' positions.

D.      *Taxpayer's Argument: Taxing Intangibles Only When Used in Centrally Assessed Businesses Fails Mathias's "Inherent Differences" Requirement and Impermissibly Classifies Property Based on Characteristics of its User*

Citing *Mathias*, Taxpayer argues: "There are no 'inherent, qualitative, genuine, rational differences' between the intangibles used by [Taxpayer] and the same intangibles used by other businesses whose property in Oregon is locally assessed, as there must be to comply with the uniformity requirement." (1/15/2021, Delta MPSJ at 1 (quoting *Mathias*, 312 Or at 58).) As to the first part of this argument, the court agrees that there is no difference in *kind* as between centrally and locally assessed intangible property. *All* intangible property is either exempt or taxable depending on whether it is used in a business listed in ORS 308.515(1), with the exception of stocks and bonds, which are effectively exempt from tax regardless whether they otherwise would be centrally or locally assessed.[22] No party has argued that any material difference in kind exists between the items constituting intangible property for local or central assessment purposes. Likewise, the court sees nothing in the law that suggests any such difference. The express, non-exclusive definition in ORS 307.020(1)(a)(D) to (I) for local

_____

[22] Debt instruments and stocks not used in a business listed in ORS 308.515(1) are "intangible personal property" under ORS 307.020 and therefore are "not subject to assessment and taxation" under ORS 307.030(2). *See* ORS 307.020(1)(a)(A) (referring to "[m]oney at interest, bonds, notes, claims, demands and all other evidences of indebtedness, secured or unsecured, including notes, bonds or certificates secured by mortgages"), (B) (referring to "[a]ll shares of stock in corporations, joint stock companies or associations"). A materially identical list of such items is excluded from the definition of "property" for purposes of central assessment. *See* ORS 308.505(14)(c)(A) (referring to "[c]laims on other property, including money at interest, bonds, notes, claims, demands or any other evidence of indebtedness, secured or unsecured"), (B) (referring to "[a]ny shares of stock in corporations, joint stock companies or associations").

assessment purposes refers to goodwill; customer lists; contracts and contract rights, patents, trademarks, and copyrights; assembled labor force; and trade secrets. For central assessment purposes, the legislature did not define "property" or "intangible" in ORS 308.505(14), but the plain meaning of "intangible property" is "property having no physical substance apparent to the senses: incorporeal property (as choses in action) often evidenced by documents (as stocks, bonds, notes, judgments, franchises) having no intrinsic value or by rights of action, easements, goodwill, trade secrets." *Webster's Third New Int'l Dictionary* 1173 (unabridged ed 2002); *see also* Appellant's Opening Brief at 6-7, *Tektronix, Inc. v. Dept. of Rev.*, 354 Or 531, 316 P3d 276 (2013) (SC S060912) (listing, as "items of intangible property," "[i]nstalled base," "[d]istribution channel," "[e]xisting technology," "[i]n-[p]rocess R&D," "[t]radename/trademarks," "[a]ssembled workforce," and "[g]oodwill"); *Tektronix, Inc. v. Dept. of Rev.*, 354 Or 531, 533 n 1, 316 P3d 276 (2013) (treating the listed items as intangible assets; declining to decide whether they were distinct from taxpayer's label of "goodwill").[23]

In contrast to the facts in *Mathias*, however, the court does find a clear difference in *use* between centrally and locally assessed property. The uses that cause intangible property to be subject to assessment and taxation are those fourteen types of business uses listed in ORS 308.515(1). Taxpayer at times seeks to equate the list of *businesses* with a list of different *owners* of the property, invoking *Mathias*'s observation that "[c]lassifications for property tax purposes based purely upon characteristics of the owner have been declared invalid * * *." *Mathias*, 312 Or at 62, n 8. (*See* 1/19/2021, Delta MPSJ at 6-7.) This court concludes that

---

[23] The court notes that certain kinds of "media" are defined as intangible property for local assessment purposes, while their status as tangible or intangible is less clear under the undefined term used for central assessment purposes; however, no party has raised an issue as to such media. *Compare* ORS 307.020(1)(a)(C) ("[I]ntangible personal property" for local assessment purposes includes "[m]edia constituting business records, computer software, files, records of accounts, title records, surveys, designs, credit references, and data contained therein.") *with* OAR 150-314-0435(4)(c)(B) (defining "software" as tangible personal property for purposes of income tax apportionment).

Taxpayer's argument fails because the central assessment statutes, and their interpretation by the Oregon Supreme Court, make clear that central assessment is triggered by use, not by ownership. *See* ORS 308.515(1) (requiring the Department to centrally assess property "used or held for future use by any company in performing or maintaining" any of the businesses listed); *Pacificorp Power Marketing v. Dept. of Rev.*, 340 Or 204, 217-218, 131 P3d 725 (2006) (holding taxpayer's rights to use city-owned power plant in taxpayer's electricity business caused facility to be assessed to taxpayer, despite taxpayer's lack of outright ownership).

The court rejects Taxpayer's argument regarding the lack of inherent differences in the property, apart from characteristics of the property's owners. The court finds this argument unique to property tax and the Uniformity Clauses. Federal Equal Protection case law presented by the parties does not address this argument.[24]

E.     *Department's Argument: Intangible Property Should Be Taxed When a Taxpayer's Property Is Subject to Unit Valuation by Department Personnel*

The Department implies that its authority under ORS 308.555 to apply unit valuation to property used in a business listed in ORS 308.515(1) provides sufficient justification under the Uniformity Clauses and the Equal Protection Clause to tax the intangibles used in such a business. The Department cites the United States Supreme Court's decision in *Adams Express*, decided some 12 years before the legislature adopted the 1909 central assessment law. That decision states:

> "Now, whenever separate articles of tangible property are joined together, not simply by a unity of ownership, but in a unity of use, there is not infrequently developed a property, intangible though it may be, which in value exceeds the

---

[24] The court finds the paucity of federal authority unsurprising, because the federal government only rarely has imposed ad valorem taxes on property. Such a tax would likely be considered a "direct" tax, required to be "apportioned among the several States" based on population, under US Const, Art I, §9 and Art I, § 2. *See* Boris Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates and Gifts*, ¶ 1.2 (3d ed 2023) ("[A]pportionment of a real property tax requires a different rate for every state in order to insure that the aggregate amount paid by each state is proportional to its population rather than to the value of the property within its borders.").

aggregate of the value of the separate pieces of tangible property.

"* * * * *

"Suppose an express company is incorporated to transact business within the limits of a state, and does business only within such limits, and, for the purpose of transacting that business, purchases and holds a few thousands of dollars' worth of horses and wagons, and yet it so meets the wants of the people dwelling in that state, so uses the tangible property which it possesses, so transacts business therein, that its stock becomes in the markets of the state of the actual cash value of hundreds of thousands of dollars. To the owners thereof, for the purposes of income and sale, the corporate property is worth hundreds of thousands of dollars. Does substance of right require that it shall pay taxes only upon the thousands of dollars of tangible property which it possesses? Accumulated wealth will laugh at the crudity of taxing laws which reach only the one, and ignore the other; while they who own tangible property, not organized into a single producing plant, will feel the injustice of a system which so misplaces the burden of taxation."

*Adams Express Co. v. Ohio State Auditor*, 166 US 185, 219-21, 17 S Ct 604, 41 L Ed 965 (1897). (*See* 4/16/2021, Dept X-MPSJ at 8-10 ("It is certainly rationally conceivable that the legislature was guided by the Court's decision to use unit valuation that captures intangible property value for centrally assessed companies doing business within and without the state.").)

There is no doubt that *Adams Express* and other longstanding decisions of the United States Supreme Court make clear that unit valuation *enables* a state to more effectively tax intangible property. *See Comcast*, 356 Or at 290 ("Central assessment also allowed assessors to capture additional value inherent in certain property. In particular, central assessment made possible assessments which would reach those large intangible values, called franchise value or good will, which could not be effectively taxed by local assessors.") (quoting *Union Pacific Railway Co. v. Cheyenne*, 113 US 516, 522, 5 S Ct 601, 28 L Ed 1098 (1885). This is because, as the quoted passage in *Adams Express* recites, many kinds of intangible property are created by the operation of real property and tangible personal property together, having been assembled and put to a common use as a unit. However, unit valuation does not *require* a state to tax

intangible property, and some states that use unit valuation do not tax intangible property.[25] *See*

*DISH Network*, 364 Or at 291-92 (describing California's regime that taxes intangible property

"'to the extent that the [intangible] property enhances the value of tangible, taxable property

which is subject to unit valuation'") (quoting Bruce A. Fowler, *Unit Valuation: Oklahoma's*

*Illegal Tax on Intangible Property*, 31 Tulsa L J 367, 381-82 (1995); CAL REV & TAX CODE §

212(c) (West 2023) ("Intangible assets and rights are exempt from taxation and, except as

otherwise provided in the following sentence, the value of intangible assets and rights shall not

enhance or be reflected in the value of taxable property. Taxable property may be assessed and

valued by assuming the presence of intangible assets or rights necessary to put the taxable

property to beneficial or productive use."); CAL REV & TAX CODE § 723 (West 2023) ("The

[California State Board of Equalization] may use the principle of unit valuation in valuing

properties of an assessee that are operated as a unit in a primary function of the assessee.");

Western States Association of Tax Administrators Committee on Centrally Assessed

Property, *Appraisal Handbook: Unit Valuation of Centrally Assessed Properties*, VI-1 to VI-6

(2009) (discussing intangible personal property exemptions in unitary valuation regimes). The

rationale stated in *Adams Express* and the practice of other states make clear that unit valuation is

the *means*, while taxing intangible property is the *end*. The Department may not rely on the

former as a rational basis for the latter. Stated in terms of *Knapp* and *Jarvill*, unit valuation is

not a "genuine difference" on which a classification of intangible property for taxation rationally

---

[25] Furthermore, the statutory overlap between central assessment and the taxation of intangible property is not absolute. Oregon stops short of taxing all intangible property used in a business listed for central assessment, having carved out several exceptions to the taxation of otherwise centrally assessable intangible property, as noted above. *See* ORS 308.505(3) (2021) (excluding television and radio stations that primarily use earth-based transmitters from the definition of "communication"); ORS 308.505(14)(c) (excluding items of intangible property representing stocks and bonds from definition of "property"); ORS 308.674(1) (capping real market value at percentage exceeding original cost of real property and tangible personal property); ORS 308.671(2) (exempting from FCC licenses and franchises held by companies in the communications business).

may be based because both are parts of the *same* central assessment regime; unit valuation is not a separate, objectively determinable fact. (*See also* 6/25/2021, Delta Reply to Post-Arg Br at 7 ("In effect, the Department avers that, if a rational classification exists for a scheme of central assessment, then it justifies any different treatment of the two groups so classified.").)[26]

Similarly, the court rejects any notion that intangible property may be taxed merely because it is assessed centrally by Department personnel, rather than by local assessors.[27] There is no question that "administrative convenience" may serve as a valid *legislative purpose* for a classification. *See, e.g., Carmichael v. Southern Coal Co.*, 301 US 495, 511, 57 S Ct 868, 81 L Ed 1245 (1937) (upholding, against federal Equal Protection challenge, state unemployment insurance tax exemption for employers of fewer than eight employees; legislature rationally could have been concerned about "administrative cost and burden" to state of taxing all small employers). However, there must first be "genuine differences" in the relevant characteristics or use of property, akin to the difference in *Carmichael* between seven employees and eight employees. *Id*. at 510-11. Central assessment is no more a "genuine difference" in the use of property than unit valuation; both are features of the provisions first enacted in 1909 to enhance the state's ability to tax intangible property.

F.    *Department's Argument: the Same Underlying Reasons that Support a Central Assessment Regime Also Support Taxing Intangibles*

The Department also argues that the businesses listed in ORS 308.515(1) share characteristics that constitute "genuine differences" when compared to other uses of intangible property.

---

[26] Indeed, the court in *Mathias* stated that even a "regulatory" classification that exists *outside* the tax at issue cannot necessarily be "borrowed and transferred to an *ad valorem* tax setting." *Mathias*, 312 Or at 62.

[27] The court posited this theory in its November 8, 2021 letter to the parties and invited their comment. (*See* 3/3/2022, PacifiCorp Resp at 16; 4/6/2022 Dept Resp at 8.)

1. *Analysis of 2009 legislative findings*

The principal source on which the Department relies to describe the objectively determinable facts unifying the list of businesses in ORS 308.515(1) is the legislature's 2009 findings, which characterize property subject to central assessment as "utility property, transportation company property, similar business property that has inherent value due to the capacity of the property to be operated as a network over a large geographic area and other property that is appropriate for central assessment * * *." Or Laws 2009, ch 128, § 1. The Department relies heavily on the term "network" as an essential element of the class of property used in the listed businesses. Taxpayer disputes, however, that the listed businesses use property as a "network" in any manner that is distinguishable from other businesses. Taxpayer points to several examples of companies in other lines of business that describe themselves in public filings as having assembled a "network" to transport or distribute goods. (Argument of David Crapo, Oral Argument Jan 18, 2022, at 2:33 (referring to a trucking logistics company, two express companies with both air and road-based operations, and a national retail chain).) Taxpayer claims that there is no genuine difference between intangible property used in those businesses and intangible property in a business listed in ORS 308.515(1).

To begin, the court considers whether and how to apply the Oregon Supreme Court's framework for analyzing statutes pursuant to *Gaines*, 346 Or at 171-72. Courts typically use that framework when interpreting a statute whose application is at issue in the case, such as a tax statute that imposes a tax or creates an exemption. *See, e.g., AKS LLC v. Dept. of Rev.*, 23 OTR 300, 307-09 (2019) (applying framework to statute imposing tax); *Bert Brundige, LLC v. Dept. of Rev.*, 23 OTR 353, 354-56 (2019) (applying *Gaines* framework to tax exemption statute). In this case, however, the 2009 findings do not create the classification at issue; it is ORS 307.030 and ORS 308.515(1) that create the classification. Rather, the 2009 findings are the opening section of a law that purports to

"modernize and clarify" the existing central assessment statutes while making no "change in the policies of the State of Oregon with respect to the central assessment system * * *." Or Laws 2009, ch 128, §1. The legislature wrote the 2009 findings 100 years after enacting the first central assessment law, and nearly 75 years after enacting the exemption for intangible property now in ORS 307.030(2). The court cannot, therefore, treat the 2009 findings as a statement of the intention of the legislature that drafted the statutes at issue. *See DeFazio v. WPPSS*, 296 Or 550, 561, 679 P2d 1316 (1984) ("The views legislators have of existing law may shed light on a new enactment, but it is of no weight in interpreting a law enacted by their predecessors."); *cf. Oregon Cable Telecommunications v. Dept. of Rev.*, 237 Or App 628, 641, 240 P3d 1122 (2010) (stating that the preamble to bill enacting law at issue "further informs our understanding of the legislature's intention"); *but see City of Portland v. Tidyman*, 306 Or 174, 185, 759 P2d 242 (1988) (placing no reliance on ordinance's list of findings that the court determined were "vague and conclusory"). However, as explained above, the court's inquiry in this case is not limited to discerning the intention of the legislature that adopted the statutes at issue; rather, the court need only supply any conceivable rationale for creating the particular list of businesses that exists today. The court will consider whether the 2009 findings supply a rational basis for taxing intangible property when used in a business listed in ORS 308.515(1); the court will apply the *Gaines* framework simply as a tool to determine the meaning of the findings.

The court starts with the text of the 2009 findings, which lists four types of property comprising centrally assessed property:

(1)    "utility property";

(2)    "transportation company property";

(3)    "similar business property that has inherent value due to the capacity of the property to be operated as a network over a large geographic area"; and

/ / /

(4)    "other property that is appropriate for central assessment."

Or Laws 2009, ch 128, § 1(1).[28]

a.    "Utility property"

Neither the 2009 law nor the central assessment statutes as in effect in 2009 or for the tax year[s] at issue define "utility." The plain meaning of "utility," as of 2009 and today, includes "public utility" as a synonym, which in turn is defined as "a business organization deemed by law to be vested with public interest usu[ally] because of monopoly privileges and so subject to public regulation such as fixing of rates, standards of service and provision of facilities." *Webster's Third New Int'l Dictionary* 2525 (unabridged ed 2002) (defining "utility"); *id*. at 1836 (defining "public utility"). The technical legal definition of "public utility" is similar. *See Black's Law Dictionary* 1686 (9th ed 2009) ("A business enterprise that performs an essential public service and that is subject to governmental regulation.  - *public utility*. (1895) 1. A company that provides necessary services to the public, such as telephone lines and service, electricity, and water. • Most utilities operate as monopolies but are subject to governmental

---

[28] Section 1 of chapter 128 states in full:

"SECTION 1. (1) The Legislative Assembly finds that the central assessment by the Department of Revenue of utility property, transportation company property, similar business property that has inherent value due to the capacity of the property to be operated as a network over a large geographic area and other property that is appropriate for central assessment is a fair, equitable and efficient way to determine value for property tax purposes and to apportion that value among local taxing districts.

"(2) The Legislative Assembly further finds that central assessment of these types of property has occurred for more than 80 years and that the central assessment system continues to operate in a fair, equitable and efficient way, but that the statutory law upon which the central assessment system is based contains obsolete or confusing language, references to antiquated technologies and disorganized structure.

"(3) The Legislative Assembly declares that the purpose of the amendments to statutes by sections 2 to 15 of this 2009 Act is to modernize and clarify the central assessment statutory law, while continuing the central assessment system as it currently operates.

"(4) The Legislative Assembly further declares that the amendments to statutes by sections 2 to 15 of this 2009 Act do not constitute a change in the policies of the State of Oregon with respect to the central assessment system and the administration of the central assessment system by the Department of Revenue."

Or Laws 2009, ch 128, §1(1).

regulation. 2. A person, corporation, or other association that carries on an enterprise for the accommodation of the public, the members of which are entitled as a matter of right to use the enterprise's facilities.") (emphasis in original); *Black's Law Dictionary* 1859 (11th ed 2019) (same). The court concludes that the plain and technical legal meanings are essentially the same, each containing the elements of public interest, monopoly privileges, and rate regulation. The legal definition merely fleshes out the plain meaning by adding the element of the public's right to use a utility's facilities, as well as some examples of services commonly provided by a public utility: telephone, electric, and water services.

For context, the court turns to other central assessment statutes in place in 2009. The central assessment statutes used the term "utility" in two places.[29] First, a "person" or "company," whose use of property in a listed business may cause the property to be subject to central assessment, included a "people's utility district," a term left undefined in the central assessment statutes but provided for in ORS chapter 261 (2009).[30] ORS 308.505(8) (2009). Second, ORS 308.515(8) (2009) referred to the making of electricity sales to "an electric utility, as defined in ORS 758.505," as one criterion for excluding certain small biomass-fueled electricity generation facilities from central assessment. In turn, ORS 758.505(4) (2009) defined an "electric utility" as either a "public utility" (*i.e.*, one regulated by the Oregon Public Utility Commission (OPUC) under ORS chapter 757 (2009)) or a "nonregulated utility" (*i.e.*, a people's utility district, a municipal utility operating under ORS chapter 225, or an electric cooperative organized under ORS chapter 62). Based on these references, the court considers the various

---

[29] Then, as now, the list of businesses in ORS 308.515(1) does not use the term "utility" or purport to limit the listed businesses to public utilities.

[30] ORS 261.050(1) (2009) generally provided for the assessment and taxation of people's utility district property "in the same manner" as property of "private corporations or individuals for the purpose of furnishing electricity or electric service to the public."

contemporaneous statutes dealing with regulated public utilities, people's utility districts, and municipally owned plants to be relevant context in interpreting "utility" as used in the 2009 findings. It is readily apparent that "public utilities" regulated by the OPUC had the hallmarks of the plain and technical legal definitions of "utility" set forth above.[31] The lines of business regulated by the OPUC were "heat, light, water or power" (ORS 757.005(1)(a)(A) (2009)), as well as certain "telecommunications" services (ORS 759.005 (2009)).[32] Also meeting the dictionary definitions of a "utility" was any petroleum "pipeline company that is a common carrier and that is regulated as to its rates or practices by the United States." ORS 772.510 (2009) (granting condemnation authority).[33]

Based on the plain and legal meanings of "utility," as well as the context found in other Oregon statutes, the court concludes that the 2009 findings use that term to refer to the four businesses listed in ORS 308.515(1)(i) through (L): heating, gas, electricity, and pipeline; as well as any "communication" businesses under ORS 308.515(1)(h) that are "telecommunications"

---

[31] Subject to numerous exceptions, regulated public utilities were allowed to operate within exclusive service territories. *See* ORS 758.305 (2009) (water); ORS 758.435 (2009) (electricity and gas); ORS 759.500(1) (2009) (telecommunications). The OPUC was charged with setting "fair and reasonable" rates that public utilities charge customers. ORS 756.040(1) (2009); ORS 759.015 (2009) ("just and reasonable"). Heat, light, water, and power companies have and had condemnation authority under ORS 772.210 (2009), as have telecommunications utilities under ORS 759.075 to 759.080 (2009).

[32] Subsection (7) of ORS 759.005 (2009) defined "telecommunications" as "the transmission of information chosen by a person, between or among points specified by the person, without change in the form or content of the information sent or received." Subsection (8) defined "telecommunications service" as "telecommunications that are offered for a fee to the public, or to such class of users as to be effectively available to the public, without regard to the facilities used to provide the telecommunications." "Telecommunications service" did not include services provided by radio common carrier; one-way transmission of television signals; private telecommunications networks; or communications of the customer that take place on the customer side of on-premises equipment. *See also* ORS 759.005(9) (2009) (defining "telecommunications utility"). *Cf.* ORS 308.505(3) (2009) (defining "communication" as used in ORS 308.515(1)(h) as "includ[ing] telephone communication and data transmission services by whatever means provided").

[33] The lines of business that are rate-regulated utilities have not changed since 2009; for the tax years at issue (2019-20, through 2022-23), the lines of business regulated by the OPUC remain "heat, light, water or power" providers and certain "telecommunications" businesses. ORS 757.005(1)(a)(A) (providing that "public utility" means an entity providing "heat, light, water or power"); ORS 757.005(1)(a)(A) (2019) (same); ORS 757.005(1)(a)(A) (2021) (same); ORS 759.005 (regulating certain "telecommunications" utilities); ORS 759.005 (2019) (same); ORS 759.005 (2021) (same).

services under ORS 759.005. The court does not rule out the possibility that additional businesses listed in ORS 308.515(1) could, upon factual examination, be found to share some or all of the characteristics of a utility: rate regulation, territorial monopoly, and elements of public interest such as condemnation authority.

      b.     "Transportation company property"

The court turns to "transportation company property," the second type of property listed in the 2009 findings. The 2009 act amended an existing definition of "transportation" in ORS 308.505. Because the findings state that "the amendments [in] this 2009 Act do not constitute a change in the policies of the State of Oregon with respect to the central assessment system and the administration of the central assessment system," the court considers both the pre-amendment definition of "transportation" and the as-amended definition. Or Laws 2009, ch 128, § 1.

The pre-amendment definition provided:

> "'Transportation' includes the carrying, conveying or moving of passengers, commodities, freight, mail, rolling stock, cars, vehicles, equipment or any other property from one place to another."

ORS 308.505(5) (2007).[34] The defined term "transportation" appeared in six of the types of business listed in ORS 308.515(1): "[r]ailroad transportation," "[e]lectric rail and trackless trolley transportation," "[p]rivate railcar transportation," "[a]ir transportation," "[w]ater transportation upon inland water of the State of Oregon," and "[p]rivate railcars of all companies not otherwise listed in this subsection, if the private railcars are rented, leased or used in railroad transportation for hire." ORS 308.515(1) (2007).

/ / /

---

[34] As used in that definition, "car" "include[d] any vehicle adapted to the rails of a railroad" (ORS 308.505(1) (2007)), and "vehicle" "mean[t] any wheeled or tracked device used in transportation under, on or in connection with the physical surface of the earth" (ORS 308.505(6) (2007)). The 2009 act did not change these definitions materially; the definition of "car" was amended to add "railcar" as a synonym for "car," and to change "includes" to "means." Or Laws 2009, ch 128, § 3. The central assessment statutes did not define other terms in the definition of "transportation."

As amended by the 2009 act, the definition of "transportation" provided:

> "'Transportation' means carrying, conveying or moving passengers or property from one place to another."

Or Laws 2009, ch 129, § 3. The 2009 law did not change the list of businesses in ORS 308.515(1), except to delete the reference to "trackless trolley" in paragraph (c).

Based on the definitions of "transportation" and their use in the pre- and post-amendment versions of ORS 308.515(1), the court concludes that "transportation company property," as used in the 2009 findings, refers to property that companies use to carry, convey, or move passengers or property from one place to another. These companies include, but are not necessarily limited to, those carrying on the eight businesses listed in ORS 308.515(1)(a) – (g) and (n). In contrast to "utility property," the court has found nothing in the term "transportation company property" that requires that transportation company businesses be subject to regulated rates, have exclusive service districts or condemnation authority, or have other characteristics of a utility.[35]

c.    "Similar business property that has inherent value due to the capacity of the property to be operated as a network over a large geographic area"

The court turns to the third category of property in the 2009 findings: "similar business property that has inherent value due to the capacity of the property to be operated as a network over a large geographic area * * *." Or Laws 2009, ch 128, § 1(1).[36] The Department refers frequently to the term "network" as the key determinant of inclusion in this third category. (2/12/2021, Dept MPSJ at 8-12; 4/2/2021, Dept Reply at 3, 7-8; 6/25/2021, Dept Post-Arg Resp Br at 3; 4/6/2022, Dept Resp to Court's Questions at 4 n 1, 8-11.) The plain meaning

---

[35] The court has found that certain railway construction companies, as well as those formed to construct sewers, canals, ditches, or flumes, had condemnation and similar powers in some circumstances. *See* ORS 772.010 to 772.105 (2009).

[36] The court assumes that "similar" refers to both of the two prior terms "utility property" and "transportation company property." *See* Jack L. Landau, *Oregon Statutory Interpretation*, 97 Or L Rev 583, 670-72 (2019) (discussing rule of last antecedent and other grammar-based rules of construction).

contemporaneous to 2009 included both physical networks of tangible property (*e.g.,* networks of fabric, highways, roots, computers connected by lines) and intangible networks consisting only of incorporeal relationships (networks of alliances or friends) or ideas (a network of beliefs). *See Webster's Third New Int'l Dictionary* 1520 (unabridged ed 2002). [37] A "network" of radio or television stations might be linked either tangibly "by wire" or by "radio relay." *Id.*[38] Contemporaneous Oregon statutes refer to intangible networks, such as a "provider network" for medical insurance purposes (ORS 742.424)(1) (2009)). The court concludes that the 2009 findings do not limit the meaning of "network" to physical systems connected by tangible personal property or real property, such as continuous lines of track, wire, or pipe. The

---

[37] The full definition of "network" in *Webster's Third New International Dictionary* is:

> **"1:** a fabric or structure of threads, cords, or wires that cross each other at regular intervals and are knotted or secured at the crossings<ribbons, lace and embroidery wrought together in a most curious piece of [*network*] — Joseph Addison>
>
> **2:** a system of lines or channels that interlace or cross like the fabric of a net<a [*network*] of highways><a [*network*] of rivers><a [*network*] of veins><a [*network*] of roots><a [*network*] of nerves>
>
> **3a:** an interconnected or interrelated chain, group, or system<a [*network*] of secret agents><a [*network*] of alliances><a [*network*] of beliefs>
> **b:** a system of computers, terminals, and data bases connected by communications lines
>
> **4:** a system of electrical conductors in which conduction takes place between certain points by more than one path
>
> **5a:** a group of local radio or television stations linked by wire or radio relay for the usually simultaneous broadcasting or televising of the same program
> **b:** a radio or television company that produces programs to be relayed to local stations for broadcast by radio or television<sold the show to a big [*network*]>
>
> **6:** a usually informally interconnected group or association of persons (such as friends or professional colleagues)<During my years of travel in Asia … I'd developed an extensive [*network*] of friends. — Alison Wright, *Yoga Journal*, May/June 2005>"

*Webster's Third New International Dictionary* 1520 (unabridged ed 2002).

[38] The court notes that the 2021 legislature amended ORS 308.505 to exclude from the definition of a centrally assessed "communication" business "the services of television and radio stations licensed by the Federal Communications Commission that use primarily earth-based transmitters to broadcast programming via radio waves to television or radio receivers that use indoor or outdoor antennas for reception * * *." Or Laws 2021, ch 421, § 1 (HB 2331) (adding ORS 308.505(3)(b) (2021)). The staff measure summary accompanying the bill stated: "The Department has not historically centrally assessed television and radio station property, but is likely to going forward." Staff Measure Summary, House Committee on Revenue, HB 2331, Apr 13, 2021, 1-2.

legislature used the term in a way that could equally encompass incorporeal networks of contractual and other relationships.

The businesses listed in ORS 308.518(1) could have either or both kinds of networks. Any of the six listed businesses involving "rail" necessarily relies on physical lines of track, but railroad companies also have long relied on the ability to contract with each other to transport goods over long distances. *See Southern Pacific Trans. Co. v. Dept. of Rev.*, 302 Or 582, 585, 732 P2d 18 (1987) (describing continental rail transportation system as including "bridge" railroads serving other carriers in specific areas). A utility might have both a tangible network of transmission lines and distribution lines for the delivery of electricity, gas, or water, as well as an intangible network of contracts to procure the commodity from others and franchises to sell within a specified service territory. An air transportation, air or railway express, or water transportation company might have a network consisting solely of intangible contract rights and permissions that allow the business to move physically unconnected airplanes or vessels from one point to another.[39]

The court finds that the third category in the 2009 findings, adopting the foregoing broad definition of "network," appears to encompass all of the businesses listed in ORS 308.515(1) (with the possible exception of toll bridges).

d.      "Other property that is appropriate for central assessment"

The fourth category of property in the 2009 findings is a catch-all that purports either to ensure that property is considered part of the class even if it does not fit within the descriptions in categories one through three, or to reserve a right in the legislature to expand the list in ORS

/ / /

---

[39] The parties have not identified a network of either type used by a toll bridge. *See* ORS 308.515(1)(m).

308.515(1) to encompass additional categories of property. As such the fourth category adds nothing to the analysis, and the court does not consider it further.

2. *Parties' arguments under 2009 findings*

The court now seeks to apply the foregoing understanding of the 2009 findings to the parties' arguments in applying the "genuine differences" test under the Uniformity Clauses.

a. Omission of bus and trucking businesses from ORS 308.515(1)

According to Taxpayer, a principal example of a business not listed in ORS 308.515(1), yet indistinguishable from those on the list, is bus and trucking companies. Taxpayer argues that, not only does the property of these companies have "inherent value due to the capacity of the property to be operated as a network over a large geographic area" (category three of the 2009 findings), but bus and trucking companies also "carry, convey, or move passengers or property from one place to another" and thus fit squarely within the definition of "transportation" in ORS 308.505(12) (category two). (3/2/2022, Delta Resp to Court's Questions at 9-11; 3/3/2022, PacifiCorp Resp Br at 30-32.) The Department does not seriously dispute these contentions. Rather, the Department responds that the legislature rationally could have excluded bus and trucking company property from central assessment because the Oregon Constitution has created a separate system of taxation that more specifically affects those businesses. The Department points out:

- The constitution requires that "[a]ny tax or excise levied on the ownership, operation or use of motor vehicles" is to be "used exclusively" for road construction, repair, maintenance, operation and use, and certain related purposes. Furthermore, any such taxes or excises imposed by the state must be generated in a manner that ensures that the share of revenues paid for light vehicles and for heavy vehicles is "fair and proportionate to the costs incurred for the highway system because of each class of vehicle." Or Const, Art IX, § 3a.

- Vehicles are required to be registered, and "the registration fees under the vehicle code are in lieu of all other taxes and licenses, * * * to which such vehicles or the owners thereof may be subject." ORS 803.585. Exceptions include municipal license fees, ad

valorem tax on "fixed load" vehicles, and the motor vehicle privilege tax and its complementary use tax imposed under ORS chapter 320. *See id.*

(*See* 4/6/2022, Dept Resp to Court's Questions at 4-7.) The Department describes these provisions as a "special system for raising revenues with respect to vehicles that use Oregon's roads." (*Id.* at 4.) Excluding from central assessment the subset of transportation companies "whose primary business consists in use of motor vehicles on public roadways" is, according to the Department, "rationally related to the end the people and legislature have chosen as the means to funding the public highway system in Oregon." (*Id.* at 7.)

Restating the Department's arguments in the two-part framework of *Knapp*, the court understands the Department to argue that the imposition of vehicle registration fees in lieu of property tax is a genuine difference that separates bus and trucking companies from other businesses listed in ORS 308.515(1), including transportation companies defined in ORS 308.505(12). From there, the Department posits that the dedication of funds to road purposes in Article IX, section 3a (3), of the Oregon Constitution, expresses a policy goal, and that the exclusion from central assessment (and along with it, the exclusion of tax on intangibles) is reasonably related to that policy goal.

Taxpayer contends that the Department's theory disintegrates on close examination. (*See* 5/4/2022, Delta Reply at 11.) The decision to exempt all *vehicles* from property tax, in order to subject them to road-dedicated license fees pursuant to a constitutional requirement, may indeed have a rational basis, but the decision at issue here, to exempt a bus or trucking company's *intangible* property, is separate. (*Id.* at 9.) In considering Taxpayer's point, the court observes that the Department does not argue that imposing ad valorem property tax on the intangible property of bus and trucking companies would constitute a "tax or excise levied on the ownership, operation or use of motor vehicles" that would trigger the dedication and

apportionment requirements under Article IX, section 3a, of the Oregon Constitution.[40]

Assuming that Article IX, section 3a does not so restrict the taxation of intangible property, then the court finds the link the Department proffers between the exemption of vehicles and the exemption of intangible property to be illusory. The Department's reasoning would impute to the legislature a rationale along the following lines: "We already exempt your vehicles from property tax; therefore, we will exempt your intangible property also." The court finds this a *non sequitur*, particularly because the law provides *no* special exemption from property tax for real property or other tangible personal property that a bus or trucking company might use (truck yards, garages, maintenance facilities, office or dispatch facilities and equipment). Recognizing that nearly any logical connection between the two exemptions would suffice under a rational basis analysis, the court nevertheless cannot conceive of one here. The business of operating a bus or trucking company is squarely within the definition of "transportation" under ORS 308.505(12), and is otherwise so similar to the listed businesses in its reliance on a network that the court finds no "genuine difference" in use.

      b.    Omission of other businesses from ORS 308.515(1): "genuine differences"

Taxpayer cites other examples of businesses not listed in ORS 308.515(1) that operate property as a network over a large geographic area, such as "distribution companies, retail companies, [and] restaurant chains." (5/4/2022, Delta Reply; *see also* 5/4/2022, PacifiCorp Reply at 3 n 2 (listing "retail distribution companies, transportation companies, hotels, restaurants,

___

[40] The logic of such a hypothetical position by the Department--essentially asking the court to look through the intangibles to the vehicles that give rise to them--arguably would preclude subjecting a bus or trucking company to *other* taxes without dedicating the revenues to roads, such as taxes on net income or the corporate activity tax. *See* ORS chs 317, 317A (providing no exemption for bus or trucking companies). The Oregon Supreme Court has rejected that logic. *See AAA Oregon/Idaho Auto Source v. Dept. of Rev.*, 363 Or 411, 421, 423 P3d 71 (2018) ("[A]s used in Article IX, section 3a, taxes 'on' the ownership of a motor vehicle are limited to those based on the fact of ownership itself—that is, ownership *qua* ownership—and they do not include taxes based on all actions that an owner might take, such as selling or buying."); *id.* at 424 (stating legislative history of Article IX, section 3a "does not indicate" that the provision applies to all taxes (for example, any business, license, regulatory, income or property tax) imposed on a status or activity involving motor vehicles).

franchises"); *see* Argument of David Crapo, Oral Argument, Jan 18, 2022 at 2:33.) A multistate retail chain, for example, may have centralized purchasing arrangements with manufacturers and food processors, operate its own regional warehouses and distribution centers, and use branded trucks to stock branded retail stores, all of which depends on centralized inventory control and nationwide advertising and marketing. Multistate restaurant chains may have similar facilities and arrangements for the procurement and movement of food and supplies and, in addition, operate under franchise arrangements with substantial intangible value. Manufacturers of consumer goods may operate their own retail stores in multiple states, in which the same intangible brand is associated with both the real property and the tangible personal property being sold. Service businesses such as banks can operate property as a network over a large geographic area as well, due, in some cases, to deregulation that has occurred since the list in ORS 308.515(1) was created. (*See* 5/4/2022, Delta Reply at 15 (banks).) *See, e.g.,* Pub L 103-328, §109, 108 Stat 2338 (1994) (allowing bank branches across state lines).[41] As a result, Taxpayer argues, many household-name companies, including many with distribution networks or other kinds of networks, derive more than 85 percent of their enterprise value from intangible assets. (*See* 5/4/2022, PacifiCorp Reply at 18 n 16 (citing BRAND FINANCE, 2020 GLOBAL INTANGIBLE FINANCE TRACKER 36-37 (2020) (table).

> In its final briefing, the Department responds by distinguishing the listed businesses as
>
> "hav[ing] value *only* from operations over some geographical area, typically large and under some type of public franchise or 'certificate of convenience and necessity.' (Railroads, airlines, electricity generation and transmission, communication, gas and oil transmission). * * * These businesses could not exist or operate if confined to a single location."

---

[41] Other service businesses readily come to mind, including professional service entities, but also hospital systems and others with large investments in real property and equipment. *See* Or Laws 1987, ch 94, § 174 (repealing former ORS 58.235, which provided, "No professional corporation organized under any law other than the law of this state shall transact business in this state."); Patrick P. T. Jeurissen, et al., *For-Profit Hospitals Have Thrived Because of Generous Public Reimbursement Schemes, Not Greater Efficiency: A Multi-Country Case Study*, 51(1) Int'l J of Health Services 67, 72 (2021) (describing growth of investor-owned hospital chains in United States); Steven Findlay, *Can a Community Hospital Stick to Its Mission When It Goes For-Profit?*, NPR (Jul 19, 2018, 9:26 AM), https://www.npr.org/sections/health-shots/2018/07/19/629675648/can-a-community-hospital-stick-to-its-mission-when-it-goes-for-profit (discussing for-profit and nonprofit hospital ownership and trends).

(5/18/2022, Dept Surreply at 2 (emphasis added); *see also* 4/6/2022, Dept Resp to Court's Questions at 11 ("[O]il pipelines, transportation properties, or communication networks * * * *must* be used as parts of systems or networks * * *.") (emphasis added); *id.* at 9 (describing property used in a listed business is "*inherently* operated as part of a system or network or incidental thereto") (emphasis added)).

By contrast, the Department describes locally assessed property as

"hav[ing] value from operations in a physical location, typically involving manufacture and sales of tangible personal property or services delivered at a particular location. (*e.g.*, hotels, shoe manufacturing and sales, technical software and hardware manufacturing and sales, banking, 'big-box' sale of goods, restaurants). * * * Although businesses with locally assessed property may own property in many locations, the business can be conducted from each location, e.g., Walgreens."

(5/18/2022, Dept Surreply at 2-3; *see also* 4/6/2022, Dept Resp Court's Questions at 10 (providing example of locally assessed property that is a "newly built standalone commercial building that may be sold to all comers and used without reference to any particular type of business operation").)

Applying *Knapp*, the court restates the Department's theory as follows:

(1) Property used in a business listed in ORS 308.515(1) has the "genuine difference" that it has value *only* if it is used in a system or network over a (typically large) geographic area. By contrast, property used for a purpose not listed in ORS 308.515(1) has value even if it is not used in a system or network over a (typically large) geographic area.

(2) A conceivable policy purpose exists that the legislature reasonably could believe is furthered by taxing intangible property only if used in a business whose property has value only if used in a system or network over a (typically large) geographic area.

The Department's asserted "genuine difference" has some initial, intuitive appeal. The Department's example of an oil and gas pipeline calls up an image of sections of pipe that have no obvious purpose unless connected together and joined to a source of supply at one end and

some distribution system at the other end, coupled with other equipment along the way to ensure pressure and safety. Other examples might include individual railroad ties, lengths of rail, and communication poles and towers. All are specialized pieces of equipment designed for a particular function within a larger whole. However, the court rejects as hyperbolic the Department's literal assertion that these individual components of a system have "value *only*" from operations over a large geographic area, or that they "must" be used in that manner. Even the early cases that establish the principle that the value of a functioning unit may exceed the value of the sum of its component parts do not rely on a notion that individual parts lack *all* standalone value. *See Adams Express*, 165 US at 222-23 ("Considered as distinct subjects of taxation, a horse is, indeed, a horse; a wagon, a wagon; a safe, a safe; a pouch, a pouch. But how is it that $23,430 worth of horses, wagons, safes, and pouches produces $275,446 in a single year? * * * The answer is obvious."); *Henderson Bridge Co. v. Kentucky*, 166 US 150, 158, 17 S Ct 532, 41 L Ed 953 (1897) ("The bridge company was assessed by the local county officials on the bridge and other tangible property the sum of [$649,735.54]. The board of valuation assessed the company for the franchise tax, under the laws above stated in the sum of [$865,157.46]."). The question of value must be one of degree; a different conclusion would ignore the "rational" part of the rational basis test.[42] *See, e.g., FCC v. Beach Communications, Inc.,* 508 US 307, 315, 113 S Ct 2096, 124 L Ed 2d 211 (1993) ("[A] legislative choice is not subject to courtroom factfinding and may be based on *rational* speculation unsupported by evidence or empirical data.") (emphasis added); *Vance v. Bradley*, 440 US 93, 111, 99 S Ct 939, 59 L Ed 2d 171 (1979) ("[T]hose challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based *could not*

---

[42] Another question of degree in the Department's argument is the reference to a "large" geographic area. Delta and PacifiCorp point out that rail lines, power plants, and other property used in the listed businesses may serve small territories. (5/4/2022, Delta's Reply to Court's Questions at 15.) The legislature's original requirement that "property," to be centrally assessed, must cross state or county lines was removed in 1913. Or Laws 1913, ch 193, § 4.

*reasonably be conceived to be true* by the governmental decisionmaker.") (emphasis added). And if the court interprets the Department's argument to mean that property used in a business listed in ORS 308.515(1) has *more* value when operated as part of a network over a large geographic area than when used otherwise, the argument becomes a truism. Under the logic of *Adams Express*, even ordinary, fungible items can generate intangibles and enhanced value when used as part of a network. *See* 165 US at 222-23 (horses, wagons, safes, pouches). The court rejects the first part of the Department's "genuine differences" argument.

The court also is skeptical as to the second part of the Department's genuine differences argument, that property used in a business *not* listed in ORS 308.515(1) has just as much value even if not used in a network. The court readily pictures a vertically integrated, high-technology manufacturing business that sends its products around the world to various facilities at different stages of production, sourcing materials in one place, forging or milling them in another, fabricating components elsewhere, and performing assembly, finishing, and testing in still other locations.[43] A particular facility in Oregon might be built to perform one stage of the process, containing highly specialized equipment that is designed for that particular stage and that particular product. The total property used worldwide, under the control of one company, may have a unit value greater than the sum of the facilities and equipment in each location when valued on a standalone basis. And the facility in Oregon may have very little value *unless* used as part of the manufacturer's network.

The court also can easily imagine that some big-box store buildings may likewise have substantially greater value when used in a system or network over a (typically large) geographic

_____

[43] The manufacturer may own some of the facilities outright and "use" other facilities owned by independent businesses, within the meaning of "use" for central assessment purposes. *See* ORS 308.515(1) (stating test for central assessment includes use, not ownership); *Pacificorp Power Marketing,* 340 Or at 206-08, 220 (upholding central assessment of electricity business taxed on power plant owned by city and subject to various contract rights for the benefit of taxpayer).

area. A single building might be easy to rebrand for use by a *different* chain, and thus have a standalone value that can be determined by reference to comparable sales; however, the building's size or other features may be designed to turn over a high volume of inventory that only the branding of *some* national or large regional chain with "networked" distribution can support. This, too, is a question of degree, but at some point it may be just as accurate to describe such a building as having value "only" when operated as part of a network over a large geographic area as to say the same about gas pipes and power lines. *See generally, e.g., Powell Street I v. Multnomah County Assessor*, 365 Or 245, 253-54, 445 P3d 297 (2019) (describing $4.71 million in improvement costs necessary to fill "anchor tenant" space in shopping center, in addition to ancillary upgrade costs triggered by those improvements).

  c.  Omission of other businesses from ORS 308.515(1): "line-drawing problems"

The Department seems to acknowledge the possibility that property used in businesses not listed in ORS 308.515(1) can be "strongly integrated," but the Department quickly dismisses that point as a "line-drawing problem." (4/6/2022, Dept Resp to Court's Questions at 9 n 4) ("This is not to say that the legislature could not reasonably have classified for central assessment other types of businesses whose property is used as part of a strongly integrated enterprise. But that is fundamentally a line-drawing problem for the legislative branch * * *.").)

Line-drawing cases, whether under the Oregon Uniformity Clauses or under the Equal Protection Clause, involve some difference--sometimes quite small--between the items on either side of the line. *See, e.g. Standard Lbr. Co.*, 112 Or at 336 (allowing graduated income tax rates based on tiers or brackets with specified dollar cutoffs); *Huckaba*, 281 Or at 30-31 (upholding minimum age of 65 for tax benefit for civil service pensions for military veterans). And under the highly deferential rational basis standard, a line is not irrational merely because some

subjects fall "just short of qualifying" as members of the favored or disfavored class.[44] *Mathews v. Diaz*, 426 US 67, 83, 96 S Ct 1883, 48 L Ed 2d 478 (1976).[45]

Nevertheless, courts require some difference between subjects on one side of the line and the other. In *Mathews*, for example, the Court was able to conclude that Congress intended to favor a class consisting of "citizens and those who are *most like* citizens," implying that those outside the class were different because they were *less like* citizens. 426 US at 83 (emphasis added). To carry out that intent, Congress drew a line that excluded some who had an "*almost* equally strong claim to favored treatment." *Id.* (emphasis added)*; see also U.S. Railroad Retirement Bd. v. Fritz,* 449 US 166, 178, 101 S Ct 453, 66 L Ed 2d 368 (1980) (upholding law phasing out "windfall" retirement benefits based on, among other things, specific number of years served and other criteria designed to favor those with a "greater equitable claim"); *Carmichael* 301 US at 510 ("It is argued here * * * that there can be no reason for a distinction, for purposes of taxation, between those who have only seven employees and those who have eight. Yet, this is the type of distinction which the law is often called upon to make.").

In this case, the legislature has exercised its prerogative to draw the classification line by means of a list rather than by specifying criteria. It thus falls to the court to infer the criteria from the list, a task for which the court has sought the parties' help. (11/8/2021, Ct Ltr at 3-5.)

/ / /

/ / /

---

[44] *See, e.g., Metropolis Theatre Co. v. Chicago,* 228 US 61, 69-70, 33 S Ct 441, 57 L Ed 730 (1913) (upholding city tax on theaters of $1,000 per year if price charged for any one ticket during the year exceeded $1).

[45] *Mathews* involved immigration law, an area that, like taxation, requires the most deferential application of the rational basis test. 426 US at 81-82 ("The reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization.") (footnote omitted); *cf Nordlinger v. Hahn*, 505 US 1, 11, 112 S Ct 2326, 120 L Ed 2d 1(1992) ("[The rational basis] standard is especially deferential in the context of classifications made by complex tax laws.").

After much diligent effort by all counsel involved, the court concludes that the final version of the line proffered by the Department reveals businesses on both sides of the line that fit the criteria *equally* and thus have no "genuine difference."

G.      *Other Arguments*

The Department argued early on in briefing that a difference between centrally assessed companies and locally assessed companies was that "many" centrally assessed companies are publicly traded stock companies while "most" locally assessed properties are not. (2/12/2021, Dept MPSJ at 11-12.)  The Department did not pursue this argument further and the court rejects it without further discussion.

H.      *"Transportation Company Property" and "Utility Property" as Separate Subclasses*

Based on the parties' arguments, the court has concluded above that the third category in the 2009 findings does not identify a set of "genuine differences" that unifies all businesses listed in ORS 308.515(1) and distinguishes them from other businesses that have a "network" of property.  Nor do the parties present other reasonably conceivable theories that distinguish the list of businesses as a group from other businesses.  The court must consider the possibility that the list in ORS 308.515(1) does not describe a single class, but rather, more than one class, each class based on a different set of classification criteria and perhaps serving a different legislative purpose.  *Cf. Jarvill*, 289 Or at 180 ("[I]f a subterritory is different in quality compared to the rest of the territory, then article I, section 32, does not prohibit a taxing authority from defining the subterritory as a separate class.").

With this in mind, the court returns to the first and second categories in the 2009 findings. The second, "transportation company property," already has been addressed.  The court has concluded above that no genuine differences distinguish the rail, air, and water transportation businesses on the list in ORS 308.515(1) from road transportation businesses, which are omitted

from the list. The taxation of intangible property used in the businesses listed in

ORS 308.515(1)(a)-(g) and (n) and the exemption of other, materially identical, transportation

company property violates the Uniformity Clauses.

By contrast, as to the first category, "utility property," the court readily finds genuine

differences between property used in a rate-regulated business and property used otherwise. In

the former, the property is "vested with public interest" because it is used in providing a

"necessary public service." This difference in use is analogous to the difference between use of

hospital property for a charitable purpose, which can support a claim for exemption from tax, as

opposed to a private purpose, which does not. *See NW Medical Lab. v. Good Samaritan*

*Hospital*, 309 Or 262, 786 P2d 718 (1990) (addressing procedural issues in case brought by

taxable medical laboratory against tax-exempt hospitals allegedly performing same functions).

Under the Uniformity Clauses, the court considers this difference a "politically imposed" or

"economic" difference in use that exists independently of the taxation regime. *See Jarvill*, 289

Or at 180. The United States Supreme Court has recognized the difference in use of utility

property as a valid ground of distinction for Equal Protection Clause purposes. *See Nashville, C.*

*& St. L. Ry. v. Browning*, 310 US 362, 368, 60 S Ct 968, 84 L Ed 1254 (1940) ( "[A state] may

treat railroads and other utilities with that separateness which their distinctive characteristics and

functions in society make appropriate * * *.").

The court considers the second part of the test articulated in *Knapp*: whether the

classification of intangible property used in a "utility" business as taxable is reasonably related to

a conceivable legislative purpose. One conceivable purpose is to enhance the existing regulatory

regime by redistributing for public purposes a portion of any value that might build up over time

in goodwill or other intangible property as the utility charges regulated fees to customers and

delivers a regulated return to investor-owners. In the trial in PacifiCorp's case, the Department presented evidence purporting to show that the price paid for utilities historically has exceeded the "book" value of utility property as determined for regulatory purposes. *See PacifiCorp v. Dept. of Rev.*, ___ OTR ___ (July 17, 2023) (slip op at 33-35; 73) (discussing the Department's "market-to-book ratio" studies). As explained in the opinion, for valuation purposes the court rejected the Department's evidence based on evidentiary and other reasons, and the court here neither validates nor invalidates the studies, including their methodologies and their results. However, under a rational basis analysis, the court cannot reject the *concept* that the legislature might wish to impose ad valorem property tax on a utility's intangibles as a kind of check against the potential buildup of such value. *See Beach Communications, Inc.*, 508 US at 315, ("[A] legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data."). Presuming, as it must, the existence of such a conceivable purpose, the court concludes that a subset of businesses listed in ORS 308.515(1), consisting of "public utilities," is a constitutionally valid class, and that intangible property used or held for future use in those businesses reasonably may be singled out for taxation. *See* ORS 174.040 (stating that statutes are generally severable).

## VI. CONCLUSION

Based on the foregoing, the court concludes that the list of businesses in ORS 308.515(1) violates the Uniformity Clauses and the federal Equal Protection Clause as to Delta, because the court finds no genuine differences between Delta's (taxable) use of intangible property in its transportation business and the (exempt) use of intangible property in road transportation businesses or in other businesses that rely on a network of property. However, the court concludes that the list in ORS 308.515(1) does not violate the Uniformity Clauses as to

PacifiCorp, because the court finds genuine differences between PacifiCorp's (taxable) use of intangible property in its business as a regulated public utility and (exempt) uses of intangible property in non-regulated businesses, and because the court further concludes that the legislature could have determined that taxing the value of intangible property of a utility complements the regulatory scheme by redistributing for public purposes some value that accrues through regulated operation and that otherwise would inure to investor-owners. The court will grant Delta's Motion for Partial Summary Judgment and deny the Department's Cross-Motion for Partial Summary Judgment. By separate order, the court will deny PacifiCorp's Motion for Partial Summary Judgment and grant the Department's Cross-Motion for Partial Summary Judgment, with respect to PacifiCorp's second claim for relief as pled in its Amended Complaint. Now, therefore,

IT IS ORDERED that Delta's Motion for Partial Summary Judgment is granted; and

IT IS FURTHER ORDERED that the Department's Cross-Motion for Partial Summary Judgment is denied.

Dated this 23rd day of August, 2023.

8/23/2023 10:05:37 AM

**Judge Robert T. Manicke**

# Appendix – Comparative Timeline and List of Law Changes

The timeline below shows relevant developments in the statutes governing the taxation of intangibles and central assessment, as well as the original and amended text of Oregon's Uniformity Clauses.

| Date | Taxation Of Intangibles | Central Assessment | Uniformity Clauses |
|---|---|---|---|
| Before 1906 | Property subject to taxation is "all property, real and personal, within this state, not expressly exempted"<br><br>"personal property" includes certain debts, stocks and capital<br><br>"real property" includes "rights and privileges" appertaining to land and improvements[47]<br><br>1906 report: "the assessment of intangible property in the State of Oregon has not been and is not now the rule. Attempts to assess such property have been very rare and confined to a few isolated assessments"[48] | None; all property assessed by local county assessors<br><br>1906 report includes draft bills and recommendations to establish central assessment | <u>Constitution of 1859</u><br><br>Art 1, § 32<br>"No tax or duty shall be imposed without the consent of the people, or their representatives in the legislative assembly; and all taxation shall be equal and uniform."<br><br>Art 1X, § 1<br>"The Legislative Assembly shall provide by law, for a uniform, and equal rate of assessment and taxation, and shall prescribe such regulations as shall secure a just valuation for taxation of all property, both real, and personal, excepting such only |
| 1907-1913 | 1907 act adds to "real property" "all franchises and privileges" granted by Oregon or locality "other than the right to be a corporation"[49] | 1909 act establishes central assessment by department's predecessor<br><br>1909 act defines "property" for central assessment purposes as including "all property, real and personal, * * * and all franchises and special franchises"[50] | |

---

[47] The Codes and Statutes of Oregon, title XXX, ch I, §§ 3037, 3038, 3057 (Bellinger & Cotton 1901).

[48] Report of the Board of Commissioners Appointed Under the Provisions of Chapter 90, Laws of 1905, for the Purpose of Examining and Reporting on Matters of Assessment and Taxation, etc., 17 (Jun 30, 1905), available at https://archive.org/details/reportboardcomm00mulkgoog/page/n5 (accessed Jan 11, 2023).

[49] Or Laws 1907, ch 268, § 2; *see also id.* § 3 (amending definition of "personal property").

[50] Or Laws 1909, ch 218, § 5; *see also id.* § 9 (adding to valuation provision that "said franchises and special franchises [are] not to be directly assessed, but to be taken into consideration in determining the value of the other property").

|  |  | 1913 act amends definition of "property" for central assessment purposes; now includes "all property, real and personal, *tangible and intangible*"[51]<br><br>1913 act removed the requirement that centrally assessed property "be doing business as one system, partly within this state and partly without, or so doing business in more than one county of the state."[52] | for municipal, educational, literary, scientific, religious, or charitable purposes, as may be specially exempted by law." |
|---|---|---|---|
| 1917 |  |  |  |
| 1929-1931 | 1927 act exempts stock and bonds issued by corporations other than banks from property tax[55]<br><br>1929 acts adopt personal and corporate net income taxes, plus separate tax on gross income from intangibles later declared unconstitutional[56]<br><br>1931 act imposes new tax on income from intangible personal property "in lieu of the archaic and impracticable ad valorem tax on the property itself"; defines "intangibles" as evidences of | 1931 act exempts centrally assessed corporations, but not other business corporations, from tax on income from intangible property[58] | As amended in 1917<br><br>Art 1, § 32<br>"no tax or duty shall be imposed without the consent of the people or their representatives in the legislative assembly; and all taxation shall be ~~equal and~~ uniform *on the same class of subjects within the territorial limits of the authority levying the tax.*"[53] |

---

[51] Or Laws 1913, ch 193, § 5 (adding italicized phrase).

[52] Or Laws 1913, ch 193, § 4 (removing phrase).

[53] Or Const, Art 1, § 32 (showing deletions and insertions with strikethrough and italics, respectively)

[55] Or Laws 1927, ch 317

[56] Or Laws 1929 chs 427 (creating corporation excise tax—on net income, including from intangibles; excluding corporations whose property is centrally assessed), 448 (creating personal income tax—on net income; excluding gross income taxed under ch 429); 429 (taxing individuals on gross interest and dividends); *see Redfield et al. v. Fisher et al.*, 135 Or 180, 292 P 813 (1931) (invalidating Or Laws 1929, ch 429).

| | | | Art IX, § 1 |
|---|---|---|---|
| | indebtedness and shares of stock[57] | | "The Legislative Assembly shall, *and the people through the initiative may,* provide by law ~~for a~~ uniform~~, and equal rate~~ *rules* of assessment and taxation~~, and shall prescribe such regulations as shall secure a just valuation for taxation of property, both real, and personal, excepting such only for municipal, educational, literary, scientific, religious, or charitable purposes, as may be specially exempted by law~~. *All taxes shall be levied and collected under general laws operating uniformly throughout the State.*"[54] |
| 1935 | 1935 act redefines property subject to taxation as all "real property" and "*tangible* personal property" within Oregon "except as may otherwise be specifically ~~exempted~~ *provided* by law"[59] | 1935 act leaves unchanged the definition of "property" subject to central assessment ("all property, real and personal, tangible and intangible")[60] <br><br> 1935 act adds "aircraft companies" to list of centrally assessed companies[61] | |
| 1977 | 1977 act adds subsection to definitions of "intangible personal property" and "tangible personal property," declaring those definitions inapplicable to centrally assessed taxpayers[62] | | |
| 1993 | 1993 act adds subsection to local assessment statute, declaring "except as provided in [central assessment statutes], intangible personal property is not subject to assessment and taxation."[63] | | |
| 1997 | Failed HB 2062 would have exempted intangible property for centrally assessed taxpayers.[64] | | |
| 1999 | Vetoed HB 2050 would have exempted intangible property for centrally assessed taxpayers.[65] | | |
| 2009 | | 2009 act includes "housekeeping" amendments to central assessment statutes, with preamble containing findings referring to "capacity of [centrally assessed] property to be operated as a network over a large geographic area"[66] | |
| 2015 | | 2015 act generally exempts the | |

---

[58] Or Laws 1931, ch 335, §§ 2.2, 2.10, 12(b); *see* Or Laws 1927, ch 427, § 11(k) (exempting centrally assessed companies); Oregon Laws, Title XXIX, ch 1, § 4187 (15) (1920) (defining centrally assessed companies).

[57] Or Laws 1931, ch 335, § 2 (defining "intangibles"). Measured by "net income," which is defined as net of deductions for interest and other specified items. *Id.* §§ 3, 10.

[54] Or Const, Art IX, § 1 (strikethrough and italics showing deletions and insertions).

[59] Or Laws 1935, ch 274, § 1 (showing deletions and insertions with strikethrough and italics, respectively).

[60] *See* Oregon Code, title LXIX, ch IV, § 69-406 (1930) (defining "property" to be centrally assessed unchanged).

[61] Or Laws 1935, ch 54, § 1 (Spec Sess).

[62] Or Laws 1977, ch 602, § 1 (amending ORS 307.020).

| | | | |
|---|---|---|---|
| | | portion of the real market value of a centrally assessed property that exceeds 130% of cost of real and tangible personal property[67] | |
| 2021 | | 2021 act excludes television and radio stations that primarily use earth-based transmitters to broadcast programming from the definition of "communication" for central assessment purposes[68] | |

The following paragraphs note additional developments not covered in the comparative timeline. In 1939, "pipe line companies, toll bridge companies, heating companies * * * people's utility districts" were added to the list.[69] In 1949, "water transportation companies engaged in the business of transporting freight or passengers for hire upon the rivers in or adjoining the state of Oregon" were added.[70] In 1951, the legislature added a statement before

---

[63] Or Laws 1993, ch 353, § 1 (amending ORS 307.030). In addition to the central assessment statutes, the amendment also excepted the statutes governing a gross receipts tax on certain rural telephone exchanges.

[64] HB 2062 (1997).

[65] HB 2050 (1999) (vetoed).

[66] Or Laws 2009, ch 128, § 1.

[67] Or Laws 2015, ch 23, § 3 (codified as ORS 307.674).

[68] Or Laws 2021, ch 421, § 1.

[69] The full text of the law as amended in 1939 was:

"To make an annual assessment, upon an assessment roll to be prepared by said commission, of the property having a situs in this state, as hereinafter defined, of all railroad companies, sleeping car companies, union station and depot companies, electric and street railway companies, express companies, telegraph companies, telephone companies, refrigerator car companies, tank line companies, private car companies, pipe line companies, toll bridge companies, heating companies, water, gas and electric companies, people's utility districts and aircraft companies engaged in air transport of passengers, freight, express or mail."

Or Laws 1939, ch 343, § 1.

[70] The full text of the law as amended in 1949 was:

"To make an annual assessment, upon an assessment roll to be prepared by said commission, of the property having a situs in this state, as hereinafter defined, of all railroad companies, sleeping car companies, union station and depot companies, electric and street railway companies, express companies, telegraph companies, telephone companies, refrigerator car

the list that the tax applied to the property used in those businesses "whether in domestic or interstate commerce or both." Or Laws 1951, ch 586, § 2. The revisions also rearranged the list and added an exception for property of businesses that are centrally assessed, but that is not used in one of the activities that triggered central assessment.[71] *Id.* In 1953, the central assessment provisions were codified in ORS chapter 308, and the list of centrally assessed companies became codified in ORS 308.515. In 1955, the legislature reorganized the statute slightly.[72] Or Laws 1955, ch 735, § 1.

---

companies, tank line companies, private car companies, pipe line companies, toll bridge companies, heating companies, water, gas and electric companies, people's utility districts, aircraft companies engaged in air transport of passengers, freight, express or mail and water transportation companies engaged in the business of transporting freight or passengers for hire upon the rivers in or adjoining the state of Oregon."

Or Laws 1949, ch 414, § 1.

[71] The full text of the law as amended in 1951 was:

"To make an annual assessment, upon an assessment roll to be prepared by said commission, of the property having a situs in this state, as hereinafter defined, of all companies engaged in performing or maintaining any of the following businesses or services, whether in domestic or interstate commerce or both, and whether mutually, or for hire, sale or consumption by other persons: Railroad transportation; railroad switching and terminal; electric rail and trackless trolley transportation; sleeping car; refrigerator car; private car; tank car; air transportation on certificated flight or by letter of registration; water transportation upon inland waters of the State of Oregon including interstate rivers and standing waters, and tide waters extending to the ocean bar, but not when incidental to transportation upon the high seas; express; telegraph communication; telephone communication including cooperative telephone districts; heating; water, gas and electric companies including people's utility districts; pipe line; toll bridge; and all companies to the extent that they own, operate or maintain refrigeration, tank or private cars for their own use. Any corporation included within the foregoing provisions, to the extent that it actively engages in any business or service not described therein or not incidental to any business or service described therein, shall not to that extent be deemed a corporation whose properties are assessed under the provisions of this Act."

Or Laws 1951, ch 586, § 2.

[72] The full text of the law as amended in 1955 was:

"(1) The State Tax Commission shall make an annual assessment, upon an assessment roll to be prepared by the commission, of the following property having a situs in this state:

"(a) The property of all companies engaged in performing or maintaining any of the following businesses or services, whether in domestic or interstate commerce or both, and whether mutually, or for hire, sale or consumption by other persons: Railroad transportation; railroad switching and terminal; electric rail and trackless trolley transportation; sleeping car; refrigerator car; private car; tank car; air transportation on certificated flight or by letter of registration; water transportation upon inland waters of the State of Oregon, except as provided in subsection (2);

In 1957, the legislature added "air or railway express" to the list of centrally assessed companies. Or Laws 1957, ch 711, § 3. The legislature also reorganized subsection (2), dealing with water transportation, and added subsections (5), about gas in containers, and (6), about entities not yet engaged in a centrally assessed business.[73] *Id.* The legislature made additional

---

express; telegraph communication; telephone communication including cooperative telephone districts; heating; water, gas and electric companies including people's utility districts; pipe line; toll bridge.

"(b) Refrigeration, tank and private cars of all companies not included in subsection (a) hereof, where such cars are rented, leased or used in railroad transportation for hire.

"(2) Water transportation companies whose watercraft ply exclusively (a) on the high seas, or (b) between the high seas and inland water ports or termini, or (c) a combination of (a) and (b), shall not be assessed under subsection (1).

"(3) For the purposes of this section, ORS 308.255 and 308.550, 'inland water' or 'inland waters' shall mean all water or waters within the State of Oregon, all interstate rivers touching Oregon and all tidewaters extending to the ocean bars.

"(4) Any corporation included within subsection (1) of this section, to the extent that it actively engages in any business or service not described therein or not incidental to any business or service described therein, shall not to that extent be deemed a corporation whose properties are assessed under ORS 308.505 to 308.660."

Or Laws 1955, ch 735, §1.

[73] The full text of the law as amended in 1957 was:

"(1) The State Tax Commission shall make an annual assessment, upon an assessment roll to be prepared by the commission, of the following property having a situs in this state:

"(a) Except as provided in subsection (2) of this section, any property held for or used by any company in performing or maintaining any of the following businesses or services or in selling any of the following commodities, whether in domestic or interstate commerce or both, and whether mutually, or for hire, sale or consumption by other persons: Railroad transportation; railroad switching and terminal; electric rail and trackless trolley transportation; sleeping car; refrigerator car; private car; tank car; air transportation on certificated flight or by letter of registration; water transportation upon inland waters of the State of Oregon; air or railway express; telegraph communication; telephone communication: heating; water; gas; electricity; pipe line; toll bridge.

"(b) Refrigeration, tank and private cars of all companies not included in paragraph (a) of this subsection, where such cars are rented, leased or used in railroad transportation for hire.

"(2) There shall not be assessed under subsection (1) of this section:

"(a) Any property used by or for water transportation companies whose watercraft ply exclusively (A) on the high seas, or (B) between the high seas and inland water ports or termini, or (C) a combination of (A) and (B), or (D) as ferries operating directly across interstate rivers; or

"(b) Any property used by or for water transportation companies exclusively for booming

changes in 1959 and 1965. Or Laws 1959, ch 109, § 1 (adding "for hire by other persons" and "or guide service" to ORS 308.515(2)(b) (1959), adding "whether or not through pipe in a gaseous form" and replacing "industrial or liquified gas" with "undiluted liquefied or industrial gas" in ORS 308.515(5) (1959)); Or Laws 1965, ch 175, § 1 (replacing "on certificated flight or by letter of registration" with "certificated by the Civil Aeronautics Board for scheduled air service"). Two 1973 bills impacted the central assessment statutes. The first defined "communication" in ORS 308.505 (1973) as "include[ing] telephone communication, telegraph communication and data transmission services by whatever means provided" and replaced "telegraph communication; telephone communication" with "communication" in ORS 308.515 (1973). Or Laws 1973, ch 102, §§ 1-2. The other added "division of the department charged with property taxation administration" to ORS 308.515(1) (1973) and replaced "held for or used" with "used or held for its own future use" in ORS 308.515(1)(a) (1973). Or Laws 1973, ch 402, § 8. Another minor change was made in 1981. Or Laws 1981, ch 623, § 4 (replacing "certificated by the Civil Aeronautics Board" with "using aircraft in excess of 75,000 pounds gross taxi weight."

In 1983, the legislature added an exemption for Amtrak property. Or Laws 1983, ch 600, § 1 (adding ORS 308.515(2)(d) (1983): "Any property of the National Railroad Passenger Corporation so long as federal law prohibits such company from paying ad valorem taxes. All unpaid ad valorem taxes levied prior to the effective date of this 1983 Act are void and the taxes shall be removed from the assessment and tax rolls."). In 1987, another exemption was added, this time for certain aircraft. Or Laws 1987, ch 601, § 1 (adding ORS 308.515(2)(e) (1987): "Any aircraft that is required to be registered under ORS 493.080 for all or any part of the

---

and rafting; dredging; log or marine salvage; ship berthing, maintenance, sludge removal, cleaning or repair; or marine or water-based construction.

"(c) Any property used by or for interstate ferries.

"(3) For the purposes of this section, ORS 308.255 and 308.550, 'inland water' or 'inland waters' shall mean all water or waters within the State of Oregon, all interstate rivers touching Oregon and all tidewaters extending to the ocean bars.

"(4) Any corporation included within subsection (1) of this section, to the extent that it actively engages in any business or service not described therein or not incidental to any business or service or sale of a commodity described therein, shall not to that extent be deemed a corporation whose properties are assessed under ORS 308.505 to 308.660.

"(5) Any company, to the extent that it furnishes industrial or liquefied gas in bottles or similar containers, is not a gas company under subsection (1) of this section. Any company, to the extent that it furnishes water for commercial irrigation, is not a water company under subsection (1) of this section. Any company which generates electricity primarily for its own use, but which makes incidental sales of its surplus electricity, is not an electric company under subsection (1) of this section.

"(6) The provisions of ORS 308.505 to 308.660 shall be construed to subject to assessment by the commission the property owned, leased or occupied by a legal entity not yet engaged in a business, service or sale of commodity enumerated in ORS 308.515, which is intended for operation or use in such a business, service or sale of commodity."

Or Laws 1957, ch 711, § 3.

calendar year, and which is not used to provide scheduled passenger service."). Some deletions were made in 1995 and 1997. Or Laws 1995, ch 256, § 1 (deleting "[a]ny company, to the extent that it furnishes water for commercial irrigation, is not a water company under subsection (1) of this section" from ORS 308.515(5) (1995)); Or Laws 1997, ch 154, § 33 (deleting references to ORS 308.705 and ORS 308.730 (repealed)). Also in 1997, the definition of what is not an electric company was revised. Or Laws 1997, ch 656, § 2 (revising definition of what does not constitute an electric company and adding reference to definition of "electric utility" in ORS 758.505). In 1999, revisions were made in 308.515(1). Or Laws 1999, ch 223, § 1 (replacing "sleeping car; refrigerator car; private car; tank car" with "private railcar transportation" in ORS 308.515(1)(a) (1999) and replacing "[r]efrigeration, tank and private cars" with "[p]rivate railcars" in ORS 308.515(1)(b) (1999)).

A 2005 technical corrections bill made nonsubstantive changes to the list of centrally assessed businesses. Or Laws 2005, ch 94, § 53. Apart from two minor changes, the text of the statute has remained the same since 2006.[74] Or Laws 2009, ch 128, § 5 (replacing "both" with

---

[74] The text of the 2017 version of 308.515 is:

"(1) The Department of Revenue shall make an annual assessment of any property that has a situs in this state and that, except as provided in subsection (3) of this section, is used or held for future use by any company in performing or maintaining any of the following businesses or services or in selling any of the following commodities, whether in domestic or interstate commerce or in any combination of domestic and interstate commerce, and whether mutually or for hire, sale or consumption by other persons:

(a) Railroad transportation;

(b) Railroad switching and terminal;

(c) Electric rail transportation;

(d) Private railcar transportation;

(e) Air transportation;

(f) Water transportation upon inland water of the State of Oregon;

(g) Air or railway express;

(h) Communication;

(i) Heating;

(j) Gas;

(k) Electricity;

(L) Pipeline;

(m) Toll bridge; or

(n) Private railcars of all companies not otherwise listed in this subsection, if the private railcars are rented, leased or used in railroad transportation for hire.

(2) The assessment described in subsection (1) of this section shall be made on an assessment roll

"in any combination of domestic and interstate commerce" in ORS 308.515(1) (2009) and deleting ORS 308.515(4) (2007)); Or Laws 2012, ch 103, §1 (moving definition of what is not considered a gas bottle company and an electric company to ORS 308.516).

---

that is prepared by the division of the department charged with property tax administration.

(3) There may not be assessed under subsection (1) of this section:

(a) Any property used by or for water transportation companies whose watercraft ply exclusively on the high seas, or between the high seas and inland water ports or terminals, or any combination thereof.

(b) Any property used by or for water transportation companies exclusively for hire by other persons for booming and rafting, dredging, log or marine salvage, ship berthing, maintenance, sludge removal, cleaning or repair, marine or water-based construction, or guide service.

(c) Any property used by or for interstate ferries or by or for water transportation companies as ferries operating directly across interstate rivers.

(d) Any property of the National Railroad Passenger Corporation.

(e) Any aircraft that is required to be registered under ORS 837.040 for all or any part of the calendar year and that is not used to provide scheduled passenger service.

(4) Any corporation included within subsection (1) of this section, to the extent that it actively engages in any business or service not described therein or not incidental to any business or service or sale of a commodity described therein, may not to that extent be deemed a corporation whose properties are assessed under ORS 308.505 to 308.681.

(5) The department shall assess property owned, leased or occupied by a legal entity not yet engaged in a business, service or sale of a commodity that is described in subsection (1) of this section if the property is intended for operation or use in the business, service or sale of the commodity.

ORS 308.515.